**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CAROLYN COX,

      Plaintiff-Appellee,

v.

STANLEY GLANZ,

      Defendant-Appellant.

No. 14-5022

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:11-CV-00457-JED-FHM)**

---

Daniel E. Smolen of Smolen, Smolen & Roytman, P.L.L.C., Tulsa, Oklahoma (Donald E. Smolen, II, of Smolen, Smolen & Roytman, P.L.L.C., Tulsa, Oklahoma; Robert M. Blakemore, Louis W. Bullock, and Patricia W. Bullock of Bullock Law Firm, Tulsa, Oklahoma, with him on the brief), for Plaintiff-Appellee.

Guy A. Fortney of Brewster & De Angelis, P.L.L.C., Tulsa, Oklahoma (Clark O. Brewster and Corbin C. Brewster of Brewster & De Angelis, P.L.L.C., Tulsa, Oklahoma, with him on the briefs), for Defendant-Appellant.

---

Before **BRISCOE**, Chief Judge, **HOLMES** and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

After Charles Jernegan committed suicide at the David L. Moss Criminal Justice Center in Tulsa, Oklahoma ("Jail"), his mother, Plaintiff-Appellee Carolyn Cox, commenced this 42 U.S.C. § 1983 action against Defendant-Appellant Stanley Glanz, the Tulsa County Sheriff ("Sheriff Glanz" or "the Sheriff"). Ms. Cox sought to hold Sheriff Glanz liable for Mr. Jernegan's suicide in his individual capacity (relying upon a supervisory-liability theory) and in his official capacity. Regarding both capacities, she alleged Eighth Amendment violations. Sheriff Glanz moved for summary judgment, asserting the defense of qualified immunity. The district court issued a ruling in which it denied the Sheriff's motion in all respects—albeit without mentioning qualified immunity—based on the existence of genuinely disputed material facts.

In this interlocutory appeal, Sheriff Glanz contends that extant caselaw at the time of Mr. Jernegan's suicide did not clearly establish that he could be held liable as a supervisor under the circumstances present here—put succinctly, where Mr. Jernegan denied having a suicidal intent during booking and no Jail staff members detected a basis for referring him for additional mental-health screening based on their interactions with him. Accordingly, the Sheriff reasons that this dearth of clearly established law means that the district court erred in (tacitly) denying him qualified immunity. The Sheriff also asserts that none of the policies or procedures he has implemented at the Jail can be characterized as the

2

moving force behind any alleged violation of Mr. Jernegan's constitutional rights; consequently, he says, there is no basis for official liability.

For ease of reference, we briefly summarize the conclusions of our ensuing detailed analysis. First, we agree with Sheriff Glanz that reversal on Ms. Cox's individual-capacity claim is justified here and that the case must be remanded to the district court. We specifically base our decision to reverse on our determination *infra* that the then-extant clearly established law would not have put a jail administrator similarly situated to Sheriff Glanz on notice that he could be held liable under § 1983 for an Eighth Amendment violation based on a prisoner's suicide where, as here, neither he nor any identified staff member whom he supervised possessed knowledge that the particular inmate who committed suicide presented a substantial risk of taking his own life. Absent such knowledge, under then-extant clearly established law, the conduct of neither Sheriff Glanz nor his identified subordinates with respect to a particular prisoner—here, Mr. Jernegan—could give rise to an Eighth Amendment violation. Consequently, Ms. Cox cannot perforce make the requisite showing under the clearly-established-law component of the well-settled qualified-immunity standard. We thus reverse the district court's summary-judgment decision denying qualified immunity to Sheriff Glanz on Ms. Cox's individual-capacity claim.

As for Ms. Cox's official-capacity claim against Sheriff Glanz, however, we confront the threshold issue of whether the exercise of our appellate jurisdiction is proper. This is so because the district court's denial of the motion for summary judgment brought by the Sheriff in his official capacity is indisputably *not* a final decision amenable to interlocutory review. Our assumption of jurisdiction over the court's resolution of the official-capacity claim would therefore only be appropriate if we invoked our discretionary power to exercise pendent jurisdiction over this claim. Sheriff Glanz, however, has *not* relied upon this generally disfavored doctrine; furthermore, we discern no legally cognizable basis for exercising pendent appellate jurisdiction under the circumstances of this case. Accordingly, we **dismiss** Sheriff Glanz's appeal from the district court's denial of summary judgment on the official-capacity claim for lack of jurisdiction.

**I**

**A**

Mr. Jernegan surrendered at the Jail on July 27, 2009, on an outstanding warrant. He was immediately arrested and processed into the facility. As part of the Jail's routine intake screening, the booking officer asked Mr. Jernegan whether he "[was] under psychiatric or a general Doctor's care"; "[was] currently taking any prescription medications"; "[had] been seen or treated in a clinic, hospital or emergency room in the last 3 days"; or was suicidal. J.A. at 326

4

(Intake Screening Form, dated July 27, 2009). Mr. Jernegan answered "no" to each of these questions, *id.*, and he indicated that he was not "currently thinking of committing suicide" on another intake form, *id.* at 327 (Gen. Info. Form, dated July 27, 2009) (reflecting that option "N," for "no," is marked directly above Mr. Jernegan's signature).

The booking officer also completed a more tailored form with questions designed to gauge an inmate's mental health. Mr. Jernegan answered the form's six questions as follows:

1.  Do you currently feel paranoid, hear voices that others do not hear or see things that others do not see? [marked "Yes"]
2.  Have there currently been a few weeks when you felt nervous or depressed? [marked "Yes"]
3.  Have you ever tried to kill yourself? [marked "No"]
4.  Are you now thinking about hurting or killing yourself? [marked "No"]
5.  Are you currently taking any medication prescribed for you by a physician for any emotional or mental health problems? [marked "Yes"]
6.  Have you ever been in a hospital for emotional or mental health problems? [marked "No"]

*Id.* at 329 (Mental Health Form, dated July 27, 2009). An explanatory note "Diag. Paranoid-Schizo" accompanies Mr. Jernegan's "[y]es" response to Question Five. *Id.*

This mental-health form indicated that further assessment should take place if, *inter alia*, an inmate answered "[y]es" to Question Five or Six, or if he answered "[y]es" to at least two of Questions One through Four. Mr. Jernegan's

5

answers satisfied both criteria: that is, he answered "[y]es" to Question Five, representing that he had been diagnosed with paranoid schizophrenia, and he answered "[y]es" to Questions One and Two. However, there is no indication in the record that any Jail employee referred Mr. Jernegan to the facility's mental-health team for follow-up care.

Nurse Faye Taylor also performed a medical examination, using her own personal screening form. On that document, she noted Mr. Jernegan's representations to her that he had "had mental health treatment or hospitalization" for paranoid schizophrenia, that he had smoked marijuana, and that he was not suicidal. *Id.* at 603 (Healthcare Intake Screening Form, dated July 27, 2009). Ms. Taylor observed that Mr. Jernegan had regular vital signs and that he appeared normal and alert. She did not mark the "[r]eferral to health care facility" or "[r]eferral to provider" options on her form. *Id.* On the basis of these findings, Ms. Taylor recommended that Mr. Jernegan be assigned to the Jail's general population.

At 12:18 p.m. the next day (July 28, 2009), Mr. Jernegan filed a medical request through the Jail's computer "kiosk" communication system to report that he needed to "spe[a]k with someone about problems." *Id.* at 362 (Request, dated July 28, 2009) (capitalization altered). He received an automated response the day after that (July 29, 2009) at 10:07 a.m.; it said, "[y]ou will be place[d] on the

6

Mental Health call out list for . . . July 30, 2009. Please give 48–72 hours from [the] time this was received to be seen, excluding Weekends and Holidays." *Id.*

Mr. Jernegan's Jail medical record revealed another relevant entry: a "Problem Oriented Record" entry dated July 30, 2009, at 8:00 a.m., which notes that healthcare employee Sara Sampson "[a]ttempted to see" Mr. Jernegan but learned that he had been moved to a different cellblock. *Id.* at 372 (Problem Oriented Record, dated July 30, 2009) (capitalization altered). Although the record does not confirm that Ms. Sampson actually visited Mr. Jernegan, supervising officers were apparently "satisfied that Sampson had performed her job as expected." *Id.* at 659 (Incident Report, dated Aug. 3, 2009).

Shortly thereafter, at approximately 9:25 a.m. (on July 30), Nurses Robin Mason and Sara Jeffries were summoned to Mr. Jernegan's cellblock, having been informed that an inmate had hanged himself. When they arrived, they found Mr. Jernegan "still hanging from a make-shift noose and being cut down by detention staff." *Id.* at 468 (Mason Aff., dated Mar. 22, 2013). Mr. Jernegan had no palpable pulse and did not respond to resuscitative measures. He was subsequently pronounced dead at a local hospital.

After reviewing Mr. Jernegan's file, Ms. Mason "became suspicious" regarding the follow-up to his kiosk request. *Id.* More specifically, she was not confident of the truth of Ms. Sampson's purported visit to Mr. Jernegan because: (1) she "had never seen any member of the mental health team at the Jail as early

7

as 8:00[ a.m.]"; (2) she had witnessed efforts by Ms. Sampson and other members of the mental-health team to "mak[e] sure to have consistent stories" about Mr. Jernegan's treatment; and (3) she "had previous experience in witnessing the falsification of records and reports at the Jail." *Id.* at 468–69. It was also disconcerting to Ms. Mason that the Jail's intake nurses' apparent practice was to refer only "acutely suicidal" inmates to the mental-health team for additional evaluation. *Id.* at 470.

The Oklahoma State Department of Health ("OSDH") conducted an investigation and determined that Mr. Jernegan was not examined by any member of the Jail's mental-health team in the time period between the filing of his kiosk report and his death. It issued a report attributing three particular deficiencies to the Jail relative to Mr. Jernegan's suicide: (1) "inmate not properly detained"; (2) "inmate not housed in an area for more frequent observations" / "inappropriate medical evaluation"; and (3) "policy used by correctional healthcare management in direct conflict with the [Oklahoma] Jail Standards." *Id.* at 625 (Report of Death Investigation, dated Aug. 3, 2009) (capitalization altered). The OSDH then filed a "Notice of Violation" documenting the Jail's failure to satisfy three of the Oklahoma Jail Standards ("Standards").

With regard to the Jail's particular violations, the OSDH first cited Standard 5-5(6), which provides: "Prisoners who are mentally ill shall be separated from other prisoners. Every effort shall be made to contact a local

hospital, clinic or mental health facility for the detention of the mentally ill."

Okla. Admin. Code § 310:670-5-5(6). The OSDH found the Jail in violation of

that standard "because [Mr. Jernegan] was not properly segregated." J.A. at 631

(Notice of Violation, dated Aug. 12, 2009). Second, the OSDH deemed the Jail's

medical policies in "direct conflict," *id.*, with Standard 5-8, which obligates

correctional facilities to provide "[a]dequate medical care" and to "develop and

implement written policies and procedures for complete emergency medical and

health care services," Okla. Admin. Code § 310:670-5-8.

And, third, the OSDH referenced Standard 5-8(2), which instructs:

> Medical triage screening shall be performed on all prisoners immediately upon admission to the facility and before being placed in the general population or housing area. Those individuals who appear to have a significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible. They shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed. . . . [A]fter stringent evaluation by the highest-ranking mental health professional, in conjunction with a senior detention supervisor, these prisoners may be authorized to share the same cell.

*Id.* § 310:670-5-8(2). The OSDH found that the Jail contravened Standard 5-8(2)

"because [Mr. Jernegan] was not housed in an area for more frequent

observations" and because the Jail conducted an "[i]nappropriate medical

evaluation." J.A. at 632.

9

**B**

**1**

Ms. Cox commenced the instant litigation in 2011. In the operative version of her complaint, she asserted claims against Sheriff Glanz, the company that provided healthcare services to the Jail, and several of the Jail's healthcare employees, including Ms. Taylor and Ms. Sampson. As relevant to this appeal, Ms. Cox sued the Sheriff in his individual and official capacities pursuant to 42 U.S.C. § 1983, alleging that his failure to provide adequate and timely mental-health screening and care constituted deliberate indifference to Mr. Jernegan's serious medical needs in violation of the Eighth Amendment. Ms. Cox averred that "Mr. Jernegan had a substantial and documented history of serious mental illness" at the Jail and, in light of this history, she asserted that the Sheriff and his staff should have perceived "a strong likelihood that Mr. Jernegan was in danger of serious personal harm." J.A. at 47 (Second Am. Compl., filed Apr. 4, 2012).

On the individual-capacity claim, Ms. Cox asserted a supervisory-liability theory grounded in the Sheriff's alleged failure to properly train and supervise Jail employees such as Ms. Taylor and Ms. Sampson. On the official-capacity claim, she stated that the Sheriff had promulgated and administered an unconstitutional policy of providing insufficient mental-health evaluation and treatment—a policy that ultimately resulted in Mr. Jernegan's death.

Sheriff Glanz moved for summary judgment, contending that he was entitled to qualified immunity on the individual-capacity claim[1] because Ms. Cox had not established that: (1) any Jail employee had acted with deliberate indifference toward Mr. Jernegan's serious medical needs; (2) *he*, as the Jail administrator, had acted with the requisite state of mind to support a deliberate-indifference claim; and (3) he had created any policy that produced the complained-of constitutional harm. He framed his qualified-immunity arguments in terms of Ms. Cox's purported failure to suitably establish a violation of a constitutional right. Similarly, in rebutting the official-capacity claim, the Sheriff argued that Ms. Cox had not shown that any of the Jail policies he administered had violated Mr. Jernegan's constitutional rights.

Ms. Cox responded to the Sheriff's assertion of qualified immunity in similar fashion—i.e., by focusing on whether a constitutional violation had occurred. She opined that her claims "raised bedrock constitutional Eighth Amendment . . . principles that appl[ied] with obvious clarity to the conduct in question." *Id.* at 444 (Pl.'s Resp. Br., filed Apr. 3, 2013). In particular, Ms. Cox alleged that Mr. Jernegan's constitutional rights were violated when he was "assessed and treated by undertrained and unsupervised [Jail] staff." *Id.* at 438.

---

[1] The defense of qualified immunity "is available only in suits against officials sued in their personal capacities, not in suits against . . . officials sued in their official capacities." *Starkey v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009); *accord Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

11

She cursorily referenced the other aspect of the well-settled qualified-immunity rubric—i.e., the existence of clearly established law that dispositively condemned the conduct at the time it occurred—insisting that Mr. Jernegan's "right to adequate medical care and to be free from deliberate indifference ha[d] been clearly established for decades." *Id.* at 444 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

In his reply brief, Sheriff Glanz rejoined that Ms. Cox had still not "present[ed] any evidence that would satisfy th[e] subjective component [of a deliberate-indifference claim] for Taylor, Sampson or Glanz." *Id.* at 991 (Def.'s Reply Br., filed Apr. 17, 2013). He concluded that "he w[as] therefore qualifiedly immune." *Id.* at 995. Sheriff Glanz did not go one step further and argue that there was no extant clearly established law supportive of Ms. Cox's claims; he was silent on this question.

**2**

On March 7, 2014, the district court issued an order denying Sheriff Glanz's motion. The court expressly ruled that "genuine disputes as to material facts[] render[ed] summary judgment inappropriate." *Id.* at 1089 (Op. & Order, filed Mar. 7, 2014). It reached this conclusion without addressing the parties' qualified-immunity arguments.

12

At the outset, the district court summarized the evidence it considered most salient, including evidence pertaining to Mr. Jernegan's other 2009 Jail bookings,[2] Sheriff Glanz's alleged knowledge of deliberately indifferent treatment of other mentally-ill inmates, and the Jail's actual practices and policies. The court then addressed Ms. Cox's individual-capacity § 1983 claim, noting that only the subjective aspect of the deliberate-indifference standard was in dispute—*viz.*, whether there was sufficient "evidence of the prison official's culpable state of mind." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).[3]

In that regard, the court reasoned, the evidence demonstrated that Jail employees either knew or should have known certain key facts, including that Mr. Jernegan had self-reported paranoid schizophrenia; that he had lodged kiosk

---

[2]     Mr. Jernegan was incarcerated in the Jail's general population in January, February, and May of 2009. The summary-judgment record contained several submissions from each of his bookings, including kiosk requests that he lodged.

[3]     Briefly stated, deliberate indifference has both an objective and a subjective component. The objective inquiry concerns "whether the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Mata*, 427 F.3d at 753 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Sheriff Glanz has not contested the district court's tacit conclusion that the objective prong of the deliberate-indifference standard was satisfied here. And this is wise. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (observing that death, "without doubt," is "sufficiently serious to meet the objective component" (citation omitted)); *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that 'suicide is a serious harm.'" (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001))). Accordingly, we also accept the court's tacit conclusion.

13

requests in prior incarcerations; and that "approximately 45 hours before he was found hanging from a bed sheet in his cell, he requested mental health help for problems, but there was no mental health visit during the two days that followed." J.A. at 1121. The court further found that "[t]he failure to refer [Mr. Jernegan] for mental health evaluation [was] consistent with the established practice at the Jail . . . of not referring even obviously mentally ill inmates unless they admitted to being suicidal." *Id.* Rejecting Sheriff Glanz's reliance upon the existence of various written policies and training materials to prove that he did not act with deliberate indifference, the district court found "genuine issues of material fact as to whether and to what extent [those] policies were followed or enforced by the Sheriff." *Id.* at 1124.

Ultimately, after explicating the content of and otherwise considering the parties' submissions, the district court concluded:

> Viewing the evidence in the light most favorable to plaintiff, the Court concludes that there are triable issues of material fact as to whether the [Sheriff's Office's] written policies were the actual policies, whether they were followed or enforced, and whether the Jail's personnel were properly trained to identify and segregate mentally ill inmates who may be at risk of suicide.
>
> The same evidence presents issues of material fact regarding whether Sheriff Glanz was on notice of constitutional deficiencies in the care of mentally ill detainees and whether his failure to take appropriate measures to remedy those deficiencies constituted deliberate indifference.

14

*Id.* at 1127 (citations omitted). However, at no point during its analysis did the court explicitly focus on the legal framework of qualified immunity—*viz.*, it did not discuss whether Ms. Cox had demonstrated the violation of a clearly established constitutional right by any of the Jail-employee defendants or by Sheriff Glanz himself. Nevertheless, it did ultimately deny Sheriff Glanz's motion for summary judgment—which asserted a qualified-immunity defense—in *all* respects.

This timely appeal followed.

## II

### A

Before reaching the merits, we must address Ms. Cox's argument that we lack jurisdiction to entertain the Sheriff's interlocutory appeal of the district court's denial of qualified immunity. *See Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 385 F.3d 1279, 1286 (10th Cir. 2004) ("Jurisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end."); *see also San Juan Cty. v. United States*, 754 F.3d 787, 792 (10th Cir. 2014). Ms. Cox contends that dismissal on jurisdictional grounds is mandatory because, as noted, the district court based its decision regarding the individual-capacity claim on the existence of genuinely disputed material facts. While we recognize the significance of Ms. Cox's concerns about the district

15

court's qualified-immunity methodology, we are satisfied, for the reasons stated below, that we have jurisdiction to proceed to the merits of this claim.

Federal "appellate courts typically do not have jurisdiction to review denials of summary judgment motions," *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1150 (10th Cir. 2006), but "[t]he denial of qualified immunity to a public official . . . is immediately appealable . . . to the extent it involves abstract issues of law," *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013). Specifically, we have jurisdiction "to review '(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.'" *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013) (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1267 (10th Cir. 2013)); *see also Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015) (describing the two prongs thusly: "(1) the defendant violated [the plaintiff's] constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity").

The district court's factual findings and reasonable assumptions comprise "the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1276 (10th Cir. 2008). When the district court "concludes that a reasonable jury could find

16

certain specified facts in favor of the plaintiff, . . . we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).

However, importantly, "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial" is *not* an abstract legal question that we may review. *Johnson v. Jones*, 515 U.S. 304, 320 (1995); *accord Allstate Sweeping*, 706 F.3d at 1267. But our jurisdiction on appeal nevertheless "is clear when the defendant does not dispute the facts alleged by the plaintiff. . . . [I]f the defendant does dispute the plaintiff's allegations[,] 'the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Farmer v. Perrill*, 288 F.3d 1254, 1258 n.4 (10th Cir. 2002) (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)); *see also Castillo*, 790 F.3d at 1018 ("[Defendant] presents an appellate argument over which we do have jurisdiction. She asserts Plaintiffs cannot establish a violation of their Eighth Amendment rights *based on the facts they have alleged.*" (emphasis added)).

In this regard, we have said that "[e]ven when the district court concludes issues of material fact exist, 'we have reviewed the legal question of whether a defendant's conduct, as alleged by the plaintiff, violates clearly established law.'" *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001)

17

(quoting *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001)). "We need not . . . decline review of a pretrial order denying summary judgment [in the qualified-immunity context] solely because the district court says genuine issues of material fact remain; instead, we lack jurisdiction only if our review would require second-guessing the district court's determinations of evidence sufficiency." *Medina*, 252 F.3d at 1130.

In light of these principles, we conclude that we can properly exercise jurisdiction over the aspect of this appeal that is based on the district court's denial of Sheriff Glanz's qualified-immunity defense.[4] At the outset, we acknowledge that Ms. Cox's concerns regarding the district court's methodology have some merit. The court's analysis was *not* consonant with our settled mode of qualified-immunity decisionmaking. Specifically, the court's central focus was on the existence *vel non* of genuinely disputed issues of material fact, and that focus is counter to our established qualified-immunity approach. *See Allstate Sweeping*, 706 F.3d at 1267. At the summary-judgment phase, a federal court's factual analysis relative to the qualified-immunity question is distinct:

> [T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal

---

[4] As we have noted, we apply a different mode of analysis to the Sheriff's challenge to the district court's disposition of Ms. Cox's official-capacity claim—specifically, as explicated *infra* in Part III.B, we conclude that we lack jurisdiction to review the court's ruling on that claim, and we dismiss this aspect of the appeal.

18

purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court.

*Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring); *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 940 n.6 (10th Cir. 2008) (exhorting courts to "exercise care not to confuse the two analytic frameworks" of qualified immunity and traditional summary judgment, though acknowledging that, "at least in some instances, this . . . is easier said than done").

Although its mode of analysis focusing on the existence *vel non* of factual disputes was wanting, the district court clearly adjudicated Sheriff Glanz's defense of qualified immunity and ruled against him, albeit tacitly so. Perhaps because it was set adrift by the deficiencies of the parties' briefing, which are explicated *infra*, the district court did not mention qualified immunity in its summary-judgment order. However—critically, for purposes of our interlocutory review—the court did explicitly deny Sheriff Glanz *all* relief in its order, and part of the relief that Sheriff Glanz unquestionably sought in his summary-judgment briefing was qualified immunity. Consequently, the court effectively denied Sheriff Glanz the defense of qualified immunity when it denied his summary-judgment motion.[5]

_____

[5] Even if this were not so, our precedent would safeguard Sheriff
(continued...)

19

Ms. Cox nevertheless suggests that the court's fact-based manner of disposing of the defense divests us of jurisdiction to reach the qualified-immunity issue on appeal. We disagree. Notably, Sheriff Glanz has accepted the truth of Ms. Cox's version of the facts for purposes of this appeal. Under our controlling caselaw (discussed *supra*), that ordinarily will permit us to address the legal issues presented by the agreed-upon set of facts, and there is nothing about this case that would counsel against following that path. *Cf. Castillo*, 790 F.3d at 1018 ("Although [Defendant] attempts to characterize the issue on appeal as Plaintiffs' failure to assert a violation of a constitutional right under clearly established law, her argument is limited to a discussion of *her version* of the facts and the inferences that can be drawn therefrom. Thus, [Defendant's] argument is actually a challenge to the district court's conclusion Plaintiffs presented sufficient evidence to survive summary judgment. As such, this court lacks jurisdiction to review her appeal at the interlocutory stage." (emphasis added) (footnote omitted)). Therefore, under settled circuit precedent, we do have

[5](...continued)
Glanz's opportunity to avail himself of the protections of the qualified-immunity defense. In this regard, we have observed that "[o]ther circuits have concluded that orders failing or refusing to consider qualified immunity are also immediately appealable," and we have "agree[d] with this approach." *Lowe v. Town of Fairland*, 143 F.3d 1378, 1380 (10th Cir. 1998) (citing caselaw from the Second, Fifth, and Eighth Circuits). This is quite appropriate because the availability of the qualified-immunity defense—which has the potential to spare a public official the burdens of trial, *see Allstate Sweeping*, 706 F.3d at 1266—should not turn on whether the district court decided to address the defense or failed (through oversight or otherwise) to do so.

20

appellate jurisdiction over Sheriff Glanz's interlocutory appeal from the denial of qualified immunity.

**B**

Ms. Cox alternatively claims that even if we have jurisdiction over this aspect of the appeal, we should not reach the merits of Sheriff Glanz's qualified-immunity arguments because he failed to raise them before the district court. Specifically, she tenders the following issue-preservation argument:

> Sheriff Glanz's primary argument on appeal is that he is entitled to qualified immunity because it is not "clearly established" that a detainee has a right to be screened for suicidal tendencies or that failure to refer an individual for a mental health screening can give rise to a civil rights violation . . . . [T]his argument was never properly raised by Sheriff Glanz as a basis for qualified immunity below.

Aplee. Br. at 30 (citation omitted). Ms. Cox avers that because Sheriff Glanz exclusively briefed the no-constitutional-violation issue at summary judgment, he is not entitled to expand the inquiry on appeal by claiming an absence of clearly established law.

In effect, Ms. Cox asks us to deem Sheriff Glanz's clearly-established-law argument to be forfeited. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011) ("Where, as here, a plaintiff pursues a new legal theory for the first time on appeal, that new theory suffers the distinct disadvantage of starting at least a few paces back from the block. . . . [I]f the theory simply wasn't raised before the district court, we usually hold it forfeited." (citations

21

omitted)). "Yet, the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary." *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013); *accord Bishop v. Smith*, 760 F.3d 1070, 1095 (10th Cir. 2014), *cert. denied*, --- U.S. ----, 135 S. Ct. 271 (2014); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *cf. Bishop*, 760 F.3d at 1095 ("Waiver through appellate-briefing omission and forfeiture through silence before the district court are admittedly distinct failures of preservation, and arguably there is more discretionary leeway to consider issues not preserved under the latter (forfeiture) than the former (appellate-briefing waiver).").

In the unique factual and legal context of this case, even assuming *arguendo* that Sheriff Glanz forfeited his appellate arguments based on the clearly-established-law prong of the qualified-immunity standard, we would deem consideration of these arguments to be an appropriate exercise of our discretion. At the outset, we observe that the qualified-immunity arguments of both parties before the district court left much to be desired. In this regard, Sheriff Glanz's briefing was assuredly not robust. Therein, he vaguely asserted, regarding qualified immunity and in particular, the constitutional-violation question, that the "materials presented in [his] Statement of Undisputed Facts . . . are direct

22

evidence that [he] [wa]s not indifferent, deliberately or otherwise." J.A. at 241 (Mot. for Summ. J., filed Feb. 28, 2013). Yet, however poorly asserted, Sheriff Glanz indisputably *did* present a qualified-immunity defense in his summary-judgment briefing. And this defense *necessarily* included the clearly-established-law question. *See, e.g.*, *Castillo*, 790 F.3d at 1019; *Roosevelt-Hennix*, 717 F.3d at 753.

The forfeiture issue turns on the extent of Sheriff Glanz's obligation to do more than nominally raise the qualified-immunity defense—that is, it turns on whether he was obliged to marshal particularized arguments in support of the clearly-established-law question, *viz.*, specific arguments demonstrating that, under then-extant clearly established law, neither he nor any of his identified subordinates violated Mr. Jernegan's Eighth Amendment rights. Even assuming *arguendo* that he was required to do this, and therefore forfeited his clearly-established-law arguments by failing to do so, we cannot ignore, in deciding whether to recognize the forfeiture, the unique briefing burdens of the nonmovant plaintiff in the qualified-immunity context, and Ms. Cox's feeble efforts to bear them.

Specifically, by asserting the qualified-immunity defense, Sheriff Glanz triggered a well-settled twofold burden that Ms. Cox was compelled to shoulder: not only did she need to rebut the Sheriff's no-constitutional-violation arguments, but she also had to demonstrate that any constitutional violation was grounded in

23

then-extant clearly established law. *See, e.g.*, *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) ("When a defendant asserts qualified immunity at summary judgment, the burden shifts to the *plaintiff*, who must clear *two hurdles* in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, *and* that the right was clearly established at the time of the alleged unlawful activity." (emphases added)); *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina*, 252 F.3d at 1128)), *cert. denied*, --- U.S. ----, 135 S. Ct. 975 (2015); *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996) ("Unless the plaintiff carries its twofold burden, the defendant prevails.").

However, Ms. Cox made no more than an anemic attempt to carry this burden as to the clearly-established-law question, merely asserting in bare-bones fashion that Mr. Jernegan's constitutional "right to adequate medical care and to be free from deliberate indifference ha[d] been clearly established for decades." J.A. at 444.[6] Put another way, Ms. Cox did virtually nothing to define the

---

[6] In this regard, Ms. Cox did cite in her summary-judgment briefing to the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976). *See* J.A. at 444. However, regarding the resolution of the clearly-established-law question, *Estelle* is patently unavailing. *Estelle* undoubtedly "laid down [some] controlling principles" regarding deliberate indifference, *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996), and likewise made clear that "negligent diagnosis or

(continued...)

24

contours of the clearly-established-law question, as to which she ultimately carried the burden of proof in the qualified-immunity context.  As a consequence, Ms. Cox did little to aid the district court in its resolution of this question and perhaps contributed to the confusion evident in the district court's misguided qualified-immunity analysis.

In any event, in deciding whether it is a proper exercise of our discretion to overlook the assumed forfeiture of Sheriff Glanz regarding the clearly-established-law question, Ms. Cox's significant briefing shortcomings on this same question—as to which she bears the burden of proof—should be taken into account.  And we do so when we elect here to reach the merits of Sheriff Glanz's qualified-immunity arguments based on the absence of clearly established law.[7]

---

[6](...continued)
treatment of a medical condition do[es] not constitute a medical wrong under the Eighth Amendment," *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). However, *Estelle* does not speak to a right to proper suicide-screening protocols, and its silence sounds a deafening ring given the Supreme Court's "repeated[ ]" admonition "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011).

[7]        Moreover, we also recognize that we can entertain a defendant's argument on the clearly-established-law prong under certain circumstances, even if the argument had been forfeited in district court, because the issue involves a pure matter of law.  Specifically, "[o]ur discretion allows us to determine an issue raised for the first time on appeal if it is a pure matter of law and its proper resolution is certain." *United States v. Lyons*, 510 F.3d 1225, 1238 (10th Cir. 2007).  These circumstances are present here, for the clearly-established-law prong of qualified immunity involves a pure matter of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985) (stating that "the appealable issue is a

(continued...)

25

## III

The Sheriff contends that the district court committed two reversible errors in ruling on Ms. Cox's § 1983 claims: he argues that the court erred when it (1) failed to grant him qualified immunity on Ms. Cox's individual-capacity claim, and (2) denied him summary judgment on Ms. Cox's official-capacity claim. For the reasons discussed herein, we conclude that the district court committed *one* reversible error. Specifically, we determine that the court erred in denying qualified immunity to the Sheriff; accordingly, we reverse that aspect of the court's judgment. However, we do not address the Sheriff's second claim of error (i.e., regarding the denial of summary judgment on Ms. Cox's official-capacity claim)—not only do we lack jurisdiction to review this claim on interlocutory appeal, but we also decline to exercise pendent appellate jurisdiction over it. Consequently, we are constrained to dismiss the aspect of the Sheriff's appeal concerning liability in his official capacity.

---

[7](...continued)

purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law"). And, as discussed *infra*, resolution of the clearly-established-law prong is certain here. In these circumstances, we can therefore entertain the argument of a defendant, like Sheriff Glanz, on the clearly-established-law prong even if the argument had been forfeited in district court. *See Dean v. Blumenthal*, 577 F.3d 60, 67 n.6 (2d Cir. 2009) (per curiam) (considering an argument on the clearly-established-law prong of qualified immunity, even though presented for the first time on appeal, because the issue involves a question of law and does not require any additional fact-finding).

**A**

As noted, Sheriff Glanz's entitlement to qualified immunity *vel non* depends on whether Ms. Cox has "show[n] that: (1) [he] violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). "We have discretion to address either prong [of this standard] first." *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Like Sheriff Glanz does in his arguments before us, we elect to focus on the second prong—wherein we inquire whether, under Ms. Cox's version of the facts, then-extant clearly established law would have given Sheriff Glanz fair warning that he could be held liable for his conduct under a supervisory-liability theory for violating Mr. Jernegan's Eighth Amendment rights.

Regarding the requisite proof of clearly established law, "[a] plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)); *see also Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011). We conclude that the right that Ms. Cox's claim

27

implicates—i.e., generally, an inmate's right to proper prison suicide screening procedures during booking—was not clearly established in July 2009.

Significantly, Ms. Cox has not directed our attention to any Supreme Court or Tenth Circuit decision (published or otherwise) that would indicate that this right was clearly established in 2009,[8] and the district court likewise did not rely on any such law. Nor, for that matter, has Ms. Cox attempted to shoulder her burden by showing that "the clearly established weight of authority from other courts . . . ha[s] found the law to be as [she] maintains." *Becker*, 709 F.3d at 1023 (quoting *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012)). On this basis alone, we could hold that Ms. Cox has not properly laid the groundwork to defeat Sheriff Glanz's assertion of qualified immunity.

In the interest of thoroughness, however, we have surveyed the then-extant caselaw that *would* have guided the Sheriff's endeavors to conform his supervisory conduct to constitutional norms. The results of our survey are detailed *infra*. Viewing the clearly-established-law question in this survey's

---

[8] Ms. Cox cannot discharge her burden by relying upon authorities that do no more than establish general legal principles—even if those principles are apposite in the Eighth Amendment deliberate-indifference context—such as the legal truism that medical professionals in certain circumstances can be held liable for handling their gatekeeper role with deliberate indifference. *See* Aplee. Br. at 49 (discussing grounds for liability stemming from "clearly established law in this Circuit with respect to medical staff acting in a 'gatekeeper' role" (citing *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000))). Ms. Cox's arguments seeking "to define clearly established law at a high level of generality" are unavailing. *al-Kidd*, 131 S. Ct. at 2084; *see also supra* note 6.

light, we confidently conclude that the extant clearly established law in July 2009 would not have put a reasonable official in Sheriff Glanz's position on notice that his supervisory conduct would effect an Eighth Amendment violation. *See Weise*, 593 F.3d at 1167 (noting that "the clearly established law must be such that it would put a reasonable official on notice that his conduct was unlawful"); *see also Quinn*, 780 F.3d at 1005 (stating that, in order to be clearly established law, "existing precedent must have placed the . . . constitutional question beyond debate." (quoting *al-Kidd*, 131 S. Ct. at 2083)). Accordingly, as a matter of law, we conclude that Ms. Cox has failed to satisfy her burden on the clearly-established-law prong of the qualified-immunity standard. Thus, Sheriff Glanz is entitled to qualified immunity.

## 1

Prison and jail officials, as well as the municipal entities that employ them, cannot "absolutely guarantee the safety of their prisoners." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999). Nonetheless, they "ha[ve] a constitutional duty to take reasonable steps to protect the prisoners' safety and bodily integrity." *Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir. 1990). "[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cty.*, 119 F.3d 862, 866 (10th Cir. 1997). Therefore, such claims "must be judged against the 'deliberate indifference to serious medical needs' test." *Estate of*

29

*Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994) (quoting

*Martin v. Bd. of Cty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990)).  As the

district court noted, the claims at issue here implicate the subjective component of

the deliberate-indifference rubric, under which the defendant must "both be aware

of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and . . . also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825,

837 (1994).

Ms. Cox's individual-capacity claim against Sheriff Glanz is predicated on

a supervisory-liability theory.  It is undisputed that Sheriff Glanz had no personal

contact with Mr. Jernegan or direct and contemporaneous knowledge of Mr.

Jernegan's treatment by Jail officials in July 2009.  Yet, in a § 1983 lawsuit,

"[s]upervisory liability 'allows a plaintiff to impose liability upon a

defendant-supervisor who creates, promulgates, [or] implements . . . a

policy . . . which subjects, or causes to be subjected that plaintiff to the

deprivation of any rights . . . secured by the Constitution.'"  *Brown v. Montoya*,

662 F.3d 1152, 1163–64 (10th Cir. 2011) (second alteration in original)

(omissions in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th

Cir. 2010)).  This does not equate to "liability under a theory of respondeat

superior."[9]  *Id.* at 1164; *accord Schneider v. City of Grand Junction Police Dep't*,

---

[9] The Supreme Court has explained:

(continued...)

30

717 F.3d 760, 767 (10th Cir. 2013). A plaintiff arguing for the imposition of supervisory liability "therefore must show an 'affirmative link' between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quoting *Schneider*, 717 F.3d at 767).

The requisite showing of an "affirmative link" between a supervisor and the alleged constitutional injury has "[come] to have three related prongs: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Dodds*, 614 F.3d at 1195; *accord Schneider*, 717 F.3d at 767. Admittedly, "[t]he contours of . . . supervisory liability are still somewhat unclear after [the Supreme Court decided] *Iqbal*, which 'articulated a stricter liability standard for . . . personal involvement.'" *Gomez*, 745 F.3d at 435 (second

---

[9](...continued)
> In a § 1983 suit . . . —where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Our caselaw appropriately notes this distinction. *See, e.g.*, *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) ("'Section 1983 does not authorize liability under a theory of respondeat superior.' For this reason, the Supreme Court has suggested the term 'supervisory liability' is 'a misnomer.'" (footnote omitted) (citations omitted)); *see also Brown*, 662 F.3d at 1164.

omission in original) (quoting *Schneider*, 717 F.3d at 768); *see also Dodds*, 614 F.3d at 1198 ("Much has been made about [the supervisory-liability] aspect of *Iqbal*, but consensus as to its meaning remains elusive."). Even so, our "particularized approach [still] applies with full force when a plaintiff proceeds under a theory of supervisory liability." *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013). We continue to require plaintiffs to demonstrate "that each defendant acted with the constitutionally requisite state of mind" by "identify[ing] . . . specific policies over which particular defendants possessed supervisory responsibility[] that violated their clearly established constitutional rights." *Id.* at 1228.

Our clearly-established-law analysis centers on whether the controlling cases "show that [Sheriff Glanz] took the alleged actions with the requisite state of mind." *Schneider*, 717 F.3d at 769. This state of mind "'can be no less than the *mens rea* required' of [any of his] subordinates [i.e., Jail employees] to commit the underlying constitutional violation." *Gomez*, 745 F.3d at 435 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). Importantly, as our discussion of the pertinent governing caselaw *infra* demonstrates, this is a *particularized* state of mind: actual knowledge by a prison official of an individual inmate's substantial risk of suicide.

**2**

**a**

For purposes of demonstrating the violation of a clearly established constitutional (i.e., Eighth Amendment) right in a jail-suicide case, our state-of-mind requirement has been settled since at least the mid-1990s. In *Estate of Hocker*, we definitively enunciated the state of mind necessary to impose deliberate-indifference liability upon jail employees when an inmate whose mental health was compromised by intoxication committed suicide shortly after booking. *See* 22 F.3d at 1000. Noting that the trend of authority in the circuit courts counseled in favor of requiring inmate-specific knowledge of a risk of suicide,[10] we rejected the Estate's invitation to hold that the booking officers' knowledge of the decedent inmate's intoxication (which the officers obtained through routine intake questioning) could, by itself, confer knowledge that she posed a specific risk of suicide. *See id.* We concluded that evidence of her

---

[10] In that regard, we gleaned guidance from decisions of the First, Sixth, Eighth, and Eleventh Circuits. *See Bowen v. City of Manchester*, 966 F.2d 13, 17 (1st Cir. 1992) ("Deliberate indifference requires a showing by the plaintiff that the public official had actual knowledge, or was willfully blind, to the serious risk that a detainee would commit suicide."); *Barber v. City of Salem*, 953 F.2d 232, 239 (6th Cir. 1992) ("[S]imple knowledge that the detainee fits the profile of a high suicide risk is not enough. *It must be knowledge specific to that particular detainee*." (emphasis added)); *Bell v. Stigers*, 937 F.2d 1340, 1344 (8th Cir. 1991) (focusing on whether there was sufficient evidence that could "reasonably support the existence of a strong likelihood that a *particular prisoner* will attempt suicide" (emphasis added)), *overruled on other grounds by Farmer*, 511 U.S. at 838; *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir. 1990) (per curiam) (same as prior cases).

"intoxication with its accompanying incoherence" did not confirm, much less "suggest[,] that [the inmate's] risk of suicide was so substantial or pervasive that knowledge c[ould] be inferred." *Id.* We held that, going forward, similarly situated plaintiffs could only succeed on this species of claim by presenting "facts . . . suggest[ing] that the [facility] staff had knowledge of the specific risk that [the deceased inmate] would commit suicide." *Id.*

Three years later, in *Barrie v. Grand County*, we noted with reference to *Hocker*, that "in this circuit . . . . the custodian must be 'deliberately indifferent' to *a substantial risk of suicide*." 119 F.3d at 868–69 (emphasis added). Maintaining our inmate-specific focus, we declined to hold jail officials liable when the decedent inmate had indicated during booking that he was intoxicated, but not suicidal; communicated that he felt "alright"; and otherwise appeared "fine" to the officers. *Id.* at 865. Under those circumstances, we concluded that the officers' assignment of the inmate to the jail's "drunk tank" (as opposed to the alternative of furnishing immediate mental-health treatment) simply did "not rise to the level of 'deliberate indifference' to a known or obvious risk, which, in [that] case, [wa]s a substantial risk of suicide." *Id.* at 869.

Our review of relevant caselaw postdating *Hocker* and *Barrie* indicates that the foregoing state of the law in our circuit—which required prison officials to possess knowledge that a specific inmate presents a substantial risk of suicide—had not changed in material respects by July 2009.

34

We are not aware of any controlling Supreme Court or Tenth Circuit decisions that directly answer this clearly-established-law inquiry. However, our view of the requirements of the clearly established law extant when Mr. Jernegan committed suicide (July 2009) does find some support in the Supreme Court's recent decision in *Taylor v. Barkes*, --- U.S. ----, 135 S. Ct. 2042 (2015) (per curiam), where the Court resolved a deliberate-indifference dispute on the clearly-established-law prong of the qualified-immunity standard. There, the Court held that, as of November 2004, there was no clearly established "right" of an inmate to be adequately screened for suicide. *See Taylor*, 135 S. Ct. at 2044–45. The *Taylor* Court emphatically stated that "[n]o decision of this Court even discusses suicide screening or prevention protocols." *Id.* at 2044.

*Taylor* teaches us that, as of November 2004, there was no constitutional right to such screening or protocols. *See Swanson v. Town of Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009) (noting that "we also examine cases published after the conduct in question to the extent they shed light on the fact that the law was *not* clearly established at the relevant time" (emphasis added)). Consequently, in November 2004, a jail's nonexistent or deficient suicide-screening measures would not have necessarily indicated that an individual prisoner's suicide was the product of deliberate indifference in violation of the Eighth Amendment. In light of *Taylor*, our reading of the contours of the law a short five years later should not be surprising. That is, irrespective of the alleged

35

deficiencies in the Jail's suicide-screening protocols, in order for any defendant, including Sheriff Glanz, to be found to have acted with deliberate indifference, he needed to first have knowledge that the specific inmate at issue presented a substantial risk of suicide. Moreover, though not dispositive, our limited corpus of nonprecedential jail-suicide decisions supports our reading of the state of the law when Mr. Jernegan committed suicide. *See, e.g.*, *Gaston v. Ploeger*, 229 F. App'x 702, 708 (10th Cir. 2007) ("[T]he appellants concede that a jailer violates [constitutional rights] if he is deliberately indifferent to a known risk that a . . . detainee will commit suicide, and they do not challenge the district court's conclusion that the law was clearly established at the time of [the inmate's] death." (citations omitted)); *Daniels v. Glase*, 198 F.3d 257, 1999 WL 1020522, at *4 (10th Cir. 1999) (unpublished table decision) ("Accordingly, 'the custodian must be "deliberately indifferent" to a *substantial risk* of suicide.'" (quoting *Barrie*, 119 F.3d at 869)); *see also Gomez*, 745 F.3d at 428 n.29 (noting that "[a]lthough not dispositive of our inquiry because of its unpublished status," an unpublished decision "need not be ignored in determining whether the law was clearly established"); *cf. Morris*, 672 F.3d at 1197 n.5 ("[W]e have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established.").[11]

---

[11]     We acknowledge that in at least one unique setting—sexual assault in prison—we have taken a different stance on the knowledge of risk that must be

(continued...)

36

alleged. In *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008), we held that a prison "official's knowledge of the risk [of sexual assault on a prisoner] need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." 516 F.3d at 916. However, our study strongly indicates that *Tafoya* is distinguishable and should not cause us to question the clear guidance of our cases decided in the jail-suicide context. Specifically, while the risk of sexual assault at issue in *Tafoya* frequently may be divined from a myriad of external factors—including, notably, the sexual *victimizer*'s characteristics—a substantial risk of suicide may be impossible to discern unless the particular inmate reveals indicia of that risk to prison officials. *Compare Cash v. Cty. of Erie*, 654 F.3d 324, 335 (2d Cir. 2011) (discussing evidence of "the risk of sexual exploitation posed by male deputies guarding female prisoners" at the county detention facility at issue), *and* Katherine Robb, *What We Don't Know Might Hurt Us: Subjective Knowledge and the Eighth Amendment's Deliberate Indifference Standard for Sexual Abuse in Prisons*, 65 N.Y.U. Ann. Surv. Am. L. 705, 708 (2010) (observing that in § 1983 sexual-assault cases, "courts typically focus their attention on the attributes of the alleged aggressor in order to determine whether subjective knowledge of risk existed," but contending nevertheless that "research shows that victim attributes are better indicators of the potential risk of sexual abuse"), *and* Robb, *supra*, at 749 (reporting that "research on rape indicates the majority of rapes are based on power dynamics"), *with* Anasseril E. Daniel, MD, Editorial, *Care of the Mentally Ill in Prisons: Challenges and Solutions*, 35 J. Am. Acad. Psychiatry & L. 406, 409 (2007) ("A comprehensive review of national and international research clearly demonstrates that inmate suicide arises from a complex array of . . . self-reinforcing risk factors. . . . includ[ing] mental illness, substance abuse, prior serious suicide attempts, chronic stresses of incarceration . . . [and] acute psychosocial stressors  . . . ." (footnote omitted)), *and* Katherine L. Smith, Comment, *Lost Souls: Constitutional Implications for the Deficiencies in Treatment for Persons with Mental Illness in Custody*, 42 Golden Gate U. L. Rev. 497, 514 (2012) (noting that "there is a natural tension between providing inmates with their mental health needs and their right to refuse treatment"), *and* Smith, *supra*, at 517 (observing that "clinical assessment [of mental health] is subjective. . . . because the mental health assessment includes current symptoms that manifest differently for different people").

We recognize that, in at least one decision in the jail-suicide context, a panel of our court cited *Tafoya* and quoted its knowledge standard. *See duBois v.*

(continued...)

Thus, Ms. Cox had the burden of establishing that Sheriff Glanz possessed no less than this particularized mental state with respect to Mr. Jernegan. *See Gomez*, 745 F.3d at 435 (noting that the supervisor's state of mind "'can be no less than the *mens rea* required' of [any of his] subordinates to commit the underlying constitutional violation." (quoting *Porro*, 624 F.3d at 1328)). As noted, Sheriff Glanz had no personal interaction with Mr. Jernegan or direct and contemporaneous knowledge of his treatment in July 2009. Therefore, insofar as he had knowledge sufficient to form the requisite mental state, it would have had to necessarily come from his subordinates. But, as demonstrated below, the record (even viewed in the light most favorable to Ms. Cox) does not establish that *any* identified Jail employee—including, notably, the two of central concern to Ms. Cox, namely, Ms. Taylor and Ms. Sampson—had knowledge that Mr. Jernegan presented a substantial risk of suicide. It follows ineluctably then that Sheriff Glanz could not have possessed such knowledge.

---

[11](...continued)
*Payne Cty. Bd. of Cty. Comm'rs*, 543 F. App'x 841, 846 (10th Cir. 2013). However, even if it could be said that *duBois* embraced the *Tafoya* standard, we of course would not be bound by it, given its nonprecedential status and the fact that it was decided *after* July 2009. But we do not believe in any event that *duBois* could be read in this manner. Notably the panel there also cited *Hocker* and *Barrie*, *see duBois*, 543 F. App'x at 846, and when the time arrived to apply the law to the facts, the panel clearly relied on the mental state as established in those authorities in concluding that the sheriff and the jail administrator could not be held individually liable under the Eighth Amendment for deliberate indifference, *see id.* at 848 (noting that there was no evidence to "support the conclusion that [jail officials] knew, or should have known, of [the deceased inmate's] condition").

**b**

In determining whether Ms. Cox has carried her evidentiary burden on the culpable-mind issue, for the reasons noted *supra*, we necessarily focus on the interactions of Sheriff Glanz's subordinates with Mr. Jernegan. Ms. Cox's averments center on two subordinates: Ms. Taylor and Ms. Sampson. *See* Aplee. Br. at 9 ("Plaintiff further argued that two of the individual health care professionals responsible for Mr. Jernegan's care at the Jail, Faye Taylor . . . and Sara Sampson . . . were deliberately indifferent to Mr. Jernegan's serious mental health care needs."). However, as demonstrated *infra*, the evidence does not indicate that either Ms. Taylor or Ms. Sampson possessed sufficient knowledge that would permit them to conclude that Mr. Jernegan presented a substantial risk of suicide.

We first assess the quantum of knowledge of Ms. Taylor, who arguably spent more time communicating with Mr. Jernegan than any other named defendant. Viewed in the aggregate, Ms. Taylor's clinical findings led her to conclude that Mr. Jernegan was *not* suicidal. Mr. Jernegan was alert and confident, and he exhibited a panoply of normal vital signs. When speaking to Ms. Taylor, he maintained direct eye contact and behaved in an "appropriate" manner, J.A. at 340 (Taylor Dep., dated Oct. 26, 2012)—while definitively telling her that he was not contemplating suicide, *see id.* at 349 ("[Mr. Jernegan] acted perfectly normal and he told me that he had never attempted suicide before. I

39

believed him there. I asked if he was suicidal now. He said no."). She duly "inform[ed] [him] that treatment was available if he was to need it." *Id.* at 354. Later, Ms. Taylor recalled that she identified "nothing to act on" in terms of Mr. Jernegan's medical record except for his reported diagnosis of paranoid schizophrenia, *id.* at 342, though even then, he "gave [her] no indication that he was having further treatment" for that claimed ailment, *id.* at 347.[12]

Thus, based on the information Ms. Taylor obtained from speaking with and observing Mr. Jernegan, her recommendation of a "general population" assignment did not reflect deliberate indifference to Mr. Jernegan's mental-health

[12]    By her own admission, Ms. Taylor was "not trained in mental health." J.A. at 338. But the focus of our subjective inquiry under the deliberate-indifference standard is on what she actually knew. Before she could abate a substantial risk of suicide, she had to know about it. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) ("The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" (quoting *Farmer*, 511 U.S. at 837)); *see also Heidtke v. Corr. Corp. of Am.*, 489 F. App'x 275, 283 (10th Cir. 2012) ("Before a physician can abate a risk, he must *know* of that risk."). Ms. Taylor said that she elected not to refer Mr. Jernegan to the mental-health team because he could not "give [her] any . . . particulars" regarding his self-reported paranoid schizophrenia. J.A. at 348. Perhaps if Mr. Jernegan had provided Ms. Taylor with such particulars, she would have possessed sufficient information to trigger an Eighth Amendment obligation to refer Mr. Jernegan for further mental-health evaluation. However, we will never know because Mr. Jernegan did not provide Ms. Taylor with such particulars. Nor is there any support in the record for the view that, absent such communications from Mr. Jernegan, his alleged substantial risk of suicide would have been obvious to someone like Ms. Taylor, who lacked mental-health training. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (noting that "the subjective component [of the deliberate-indifference standard] is not satisfied, absent an extraordinary degree of neglect" and "[a] claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious").

needs and, more specifically, his risk of suicide. Altogether, under the totality of the circumstances, it is pellucid that Ms. Taylor had *no* knowledge that Mr. Jernegan presented a substantial risk of suicide. Consequently, Ms. Taylor could not have formed the requisite state of mind that would constitute deliberate indifference.

Turning to Ms. Sampson, the mental-health employee apparently assigned to visit Mr. Jernegan on the morning of his death, we have even less information to evaluate with respect to her. The principal component of the record speaking to Ms. Sampson's knowledge is her note in Mr. Jernegan's file stating: "Attempted to see [inmate] but [inmate] had been re-located to J1 from F18. Plan to assess in J1." *Id.* at 372. Presumably, Ms. Sampson was aware of the reason for her visit—*viz.*, Mr. Jernegan's submission of a kiosk report claiming that he needed to "spe[a]k with someone about problems," *id.* at 362, and the subsequent standard automated response, which served as notice that he had been placed on the Jail's mental-health call-out list. But these extremely vague data points miss the mark for purposes of deliberate indifference. *Nothing* about the limited information to which Ms. Sampson was privy would have reasonably, much less obviously, conveyed to her that Mr. Jernegan presented a substantial risk of suicide. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious."); *see also Sealock v. Colorado*, 218

41

F.3d 1205, 1209 (10th Cir. 2000). More specifically, because the parts of the record germane to Ms. Sampson's knowledge indicate virtually nothing about the nature of Mr. Jernegan's ostensible medical problem, they certainly could not support the conclusion that Ms. Sampson had knowledge that Mr. Jernegan posed a substantial risk of suicide. For that reason, we reject Ms. Cox's argument that Ms. Sampson possessed the requisite mental state to constitute deliberate indifference.

In sum, Ms. Cox has not demonstrated that either Ms. Taylor or Ms. Sampson had sufficient knowledge regarding Mr. Jernegan's purported risk of suicide to be found to have acted with deliberate indifference toward the risk. Mr. Jernegan's observable symptoms were susceptible to a number of interpretations; suicide may well have been one possibility, but the facts known to those with whom he interacted did not establish that it was a substantial one. *Cf. Hott v. Hennepin Cty.*, 260 F.3d 901, 906 (8th Cir. 2001) (noting, in a case where the inmate denied suicidal ideation during booking, that "something more than an inmate's gloomy affect is required to trigger a duty to inquire whether he is feeling suicidal"); *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (noting, regarding an inmate who had been prescribed medication for obvious psychiatric problems, that "strange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn," could not give rise to deliberate-indifference liability). We cannot

42

say that Ms. Taylor—who directly interacted with Mr. Jernegan—understood Mr. Jernegan to be an inmate who presented a substantial risk of suicide. We likewise cannot say that Ms. Sampson possessed that particularized knowledge regarding Mr. Jernegan—especially given that, on Ms. Cox's version of the facts, Ms. Sampson *never* directly interacted with Mr. Jernegan. In sum, we cannot say that these two Jail employees possessed the kind of knowledge that, under controlling circuit precedent, could form the basis of a deliberate-indifference claim in the jail-suicide context.

At bottom, when confronting individual-capacity § 1983 claims, our "focus must always be on the *defendant*—on the . . . injury *he* inflicted or caused to be inflicted, and on *his* motives. This is because § 1983 isn't a strict liability offense." *Porro*, 624 F.3d at 1327. As noted, Sheriff Glanz had no personal interaction with Mr. Jernegan or direct and contemporaneous knowledge of his treatment in July 2009. Therefore, insofar as he had knowledge sufficient to form the requisite mental state, it would have had to necessarily come from his subordinates, notably Ms. Taylor or Ms. Sampson. Because they did not possess such knowledge, the conclusion inexorably follows that Sheriff Glanz could not have possessed such knowledge. Accordingly, though we have not ignored Ms. Cox's strong assertions regarding the systemic failings of the Jail's mental-health screening and treatment protocols, which quite understandably troubled the district court, we conclude that Ms. Cox has nevertheless failed to establish that

43

Sheriff Glanz acted as to Mr. Jernegan with the requisite mental state to constitute deliberate indifference. In other words, she has not carried her burden regarding the essential subjective component of the deliberate-indifference standard.

In sum, for the reasons stated, we cannot conclude that Sheriff Glanz's conduct constituted an Eighth Amendment violation under the law that was clearly established at the time of Mr. Jernegan's death. Therefore, Ms. Cox cannot satisfy the clearly-established-law component of the qualified-immunity standard. We must accordingly reverse the district court's denial of qualified immunity to the Sheriff on Ms. Cox's individual-capacity claim under § 1983.

**B**

Next, Sheriff Glanz challenges the district court's denial of summary judgment to him on Ms. Cox's official-capacity § 1983 claim. This species of claim "represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Under *Monell*, a local governmental unit such as a municipality or a county, like Tulsa County, "is a 'person' subject to § 1983 liability," *McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014), and a "suit against Sheriff [Glanz] in his official capacity as sheriff is the equivalent of a suit against [Tulsa] County," *Lopez*, 172 F.3d at 762.

On appeal, Sheriff Glanz contends that the district court "erred when it denied [his] Motion for Summary Judgment because [his official] policies,

44

patterns or practices . . . were not the moving force behind any alleged constitutional deprivation of Mr. Jernegan." Aplt. Opening Br. at 4; *see City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (holding that a county "can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation'" (alteration in original) (citations omitted)). The Sheriff likewise argues that the court "erred when it denied [his] Motion for Summary Judgment on . . . institutional liability in the absence of any underlying [constitutional] violation." Aplt. Opening Br. at 5; *see City of Canton*, 489 U.S. at 395 (noting that imposing official-capacity § 1983 liability is not appropriate "absent . . . a very close causal connection to [some] violation of constitutional rights"). He consequently presents for our review arguments concerning the overarching policymaking and policy-implementation procedures of the county, which are typically focal points in an official-capacity-liability inquiry. As we have specifically explained, this type of claim requires "the plaintiff [to] prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009); *see also Whitesel v. Sengenberger*, 222 F.3d 861, 870 (10th Cir. 2000).

All of the foregoing considerations aside, however, Sheriff Glanz faces a problem that necessarily precedes any inquiry concerning Tulsa County's policymaking apparatus or the commission *vel non* of a constitutional violation.

45

That problem stems from the fact that his appeal is interlocutory—and, although (as discussed at some length *supra*) an interlocutory appeal is proper under certain circumstances from a district court's denial of qualified immunity, *see Fancher*, 723 F.3d at 1198–99, "[n]o such right of appeal applies to [a county's] appeal" from the denial of summary judgment, *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994). The reason for this distinction is that "[t]he denial of a motion for summary judgment, *unrelated to qualified immunity*, is not a final action." *Walter*, 33 F.3d at 1242 (emphasis added); *see also Lynch v. Barrett*, 703 F.3d 1153, 1163 (10th Cir. 2013) (noting that a court's denial of a local governmental entity's "standard motion for summary judgment[,]. . . . a motion which raised a 'mere defense to liability[,]' . . . does not constitute a final decision under § 1291 and is not appealable as such" (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 43 (1995))). Further, under well-settled precedent, ordinarily an official-capacity defendant—who is not entitled to rely upon qualified immunity, *see Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005)—cannot pursue an interlocutory appeal as a matter of right, because he "cannot invoke the collateral order doctrine to justify appeal of an otherwise nonappealable decision," *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995).

Nonetheless, "[w]e have previously recognized the doctrine of pendent appellate jurisdiction, under which we exercise jurisdiction over an otherwise

46

nonfinal and nonappealable lower court decision that overlaps with an appealable decision." *Moore*, 57 F.3d at 929; *accord Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1148 (10th Cir. 2011). The doctrine is "discretionary, [and] the exercise of pendent appellate jurisdiction 'is generally disfavored.'" *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998) (quoting *Moore*, 57 F.3d at 929); *accord Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1200 (10th Cir. 2002); *see also Bryson v. Gonzales*, 534 F.3d 1282, 1285–86 (10th Cir. 2008) ("Pendent appellate jurisdiction is . . . disfavored in the qualified immunity context.").

As the Supreme Court has suggested, our discretionary exercise of pendent jurisdiction over an otherwise unappealable (i.e., pendent) claim "may be appropriate where a district court's decision on a pendent claim was 'inextricably intertwined' with the district court's decision on a non-pendent claim, or 'where [appellate] review of the former [is] necessary to ensure meaningful review of the latter.'" *Crowe & Dunlevy*, 640 F.3d at 1148 (alterations in original) (quoting *Swint*, 514 U.S. at 51). We exercise this discretionary authority sparingly, *see Moore*, 57 F.3d at 930 (characterizing *Swint* as a "narrow avenue for the continued use of pendent appellate jurisdiction left open by" the Supreme Court), and "[w]e have interpreted *Swint* to mean that the exercise of our pendent appellate jurisdiction is *only* appropriate [1] when 'the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or [2] where

47

review of the nonappealable decision is necessary to ensure meaningful review of the appealable one,'" *Crowe & Dunlevy*, 640 F.3d at 1148 (quoting *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 915 (10th Cir. 2008)). Further, "[t]o be inextricably intertwined, . . . the pendent claim must be 'coterminous with, or subsumed in,' the claim properly before the court." *Lee v. Nicholl*, 197 F.3d 1291, 1297 (10th Cir. 1999) (quoting *Moore*, 57 F.3d at 929).

Sheriff Glanz has not asked us to exercise our discretion to assume pendent jurisdiction over the official-capacity claim in this interlocutory appeal, and we "will not make arguments for [him] that [he] did not make in [his appellate] briefs." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001). But quite apart from that failing, we harbor grave doubt as to the propriety of exercising pendent jurisdiction over this claim. In other words, we question whether either of the two accepted rationales for exercising pendent appellate jurisdiction could be established here—i.e., interrelatedness of claims or the need to ensure meaningful review of a properly appealable claim.

First, we strongly doubt that Ms. Cox's pendent (i.e., official-capacity) and non-pendent (i.e., individual-capacity) claims are interrelated. We generally will allow "a suit [against the county] to proceed when immunity [based on a lack of clearly established law] shields the individual defendants." *Lynch*, 703 F.3d at 1164 (second alteration in original) (quoting *Watson v. City of Kan. City*, 857 F.2d 690, 697 (10th Cir. 1988)). This is because, as we suggested in *Moore*,

48

when we resolve an individual-capacity § 1983 claim on the clearly-established-law prong of qualified immunity, our analysis often, as a matter of law, does *not* turn on issues inextricably intertwined with those implicated by an official-capacity claim arising out of the same facts. *See* 57 F.3d at 930 ("[T]he [governmental entity's] appeal might present different issues than [the individual defendant's] appeal if we conclude[] that . . . [the individual defendant] was protected by qualified immunity because th[e plaintiff's constitutional] rights were not clearly established."); *see also Lynch*, 703 F.3d at 1163–64 ("*Moore* tells us that *if* we had held in this case that Defendant Officers' conduct did not violate Plaintiff's constitutional right . . . , that holding would have resolved any issue presented by Defendant City's appeal. . . . But because we *assumed* Defendant Officers violated Plaintiff's right . . . and *held* they were entitled to qualified immunity based on the lack of clearly established law, Defendant City's appeal i[s] not 'inextricably intertwined' with Defendant Officer's appeal." (citations omitted)). Stated otherwise, even if the Sheriff had sought pendent appellate jurisdiction, we would be inclined to reject his request on the ground that determining his entitlement *vel non* to qualified immunity here implicates an issue distinguishable from the official-capacity inquiry. And that specific qualified-immunity issue, as discussed *supra*, is whether the challenged conduct constituted an Eighth Amendment violation under clearly established law existing in July 2009.

49

Additionally, we can undertake—indeed we *have* undertaken in Part III.A, *supra*—a meaningful analysis of Sheriff Glanz's appeal from the denial of qualified immunity (i.e., the non-pendent claim) without exercising pendent jurisdiction over the official-capacity claim. Our determination that Sheriff Glanz is entitled to qualified immunity on the individual-capacity § 1983 claim, as we have discussed at length, turns on whether Sheriff Glanz's conduct and that of his identified subordinates with respect to Mr. Jernegan constituted an Eighth Amendment deliberate-indifference violation *under then-extant clearly established law*. We were not required to decide the core issues implicated in the official-capacity § 1983 claim, which include whether, *under our current law*, that challenged conduct as regards Mr. Jernegan gave rise to an Eighth Amendment violation. Therefore, as shown from our analysis *supra*, we have grave doubt that there would be any appropriate basis for our exercise of pendent jurisdiction over the official-capacity claim.

Ultimately, under our controlling circuit precedent, "[t]here is nothing anomalous about allowing . . . a suit [against an official defendant] to proceed when immunity [based on a lack of clearly established law] shields the individual defendants." *Lynch*, 703 F.3d at 1164 (third alteration in original) (omission in original) (quoting *Watson*, 857 F.2d at 697). The foregoing applies with equal force to this appeal: Sheriff Glanz does not ask us to exercise pendent appellate jurisdiction over the official-capacity claim, and we perceive no reasoned basis to

50

do so *sua sponte*. As a result, "[n]othing at this point prevents [Ms. Cox's] claim against [the Sheriff in his official capacity] from proceeding." *Id.* We thus decline to exercise pendent jurisdiction over Ms. Cox's official-capacity claim. And, because the pendent-jurisdiction doctrine is the only legally cognizable jurisdictional foothold for this claim, we are constrained to dismiss this aspect of the Sheriff's appeal for lack of appellate jurisdiction.[13]

---

[13]     In our view, Sheriff Glanz is not situated to claim any unfairness associated with our determination that we lack jurisdiction to review the district court's resolution of Ms. Cox's official-capacity claim. As discussed *supra*, the Sheriff confined his appellate briefing to the issue of whether any alleged constitutional right would have been clearly established at the time Mr. Jernegan committed suicide, and we have honored his strategic choice in assessing the merits of this appeal. One consequence of this choice, however, is the creation of a disconnect between the individual-capacity and official-capacity claims that renders these claims' core issues distinguishable. And this disconnect, occasioned by the Sheriff's own presentation of his appellate arguments, sounds the death knell for the official-capacity aspect of his appeal, which we ultimately dismiss.

Morever, although Ms. Cox does not contend that Sheriff Glanz *cannot* properly avail himself of the pendent-jurisdiction doctrine to interlocutorily appeal from the district court's denial of summary judgment on her official-capacity claim, it is clear that her silence on the matter is of no moment. *See, e.g.*, *United States v. Battles*, 745 F.3d 436, 447 (10th Cir.) ("It is axiomatic that we are obliged to *independently inquire* into the propriety of our jurisdiction." (emphasis added)), *cert. denied*, --- U.S. ----, 135 S. Ct. 355 (2014); *United States v. Torres*, 372 F.3d 1159, 1161 (10th Cir. 2004) ("Although the government has not challenged our jurisdiction to hear this appeal, 'it is the duty of the federal court to determine the matter *sua sponte*.'" (quoting *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974))).

**IV**

For the foregoing reasons, we **REVERSE** the district court's denial of summary judgment to Sheriff Glanz on Ms. Cox's individual-capacity Eighth Amendment claim and **REMAND** with instructions to the court to enter judgment in favor of Sheriff Glanz on this claim (that is, to grant him qualified immunity). We **DISMISS** the portion of the appeal relating to the district court's denial of summary judgment to Sheriff Glanz on Ms. Cox's official-capacity claim for lack of appellate jurisdiction and **REMAND** for further proceedings consistent with this opinion.