**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STEVE SPENCER,

      Plaintiff - Appellee,

v.

CHRIS ABBOTT, PA - Physician's
Assistant; CRAIG JENSEN, Medical
Technician for UDC; JERRY MILLER,
UDC Custody Officer; RODGER
MACFARLANE, Med Tech,

      Defendants - Appellants,

and

RICHARD GARDEN, Director of
Clinical Services Bureau for UDC;
STEVE MECHAM, Nurse; DALE
WHITNEY, Correctional Officer,

      Defendants.

No. 16-4009
(D.C. No. 2:10-CV-00626-CW)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY** and **HOLMES**, Circuit Judges.[**]

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]     The Honorable Neil Gorsuch heard oral argument in this appeal, but has since been confirmed as an Associate Justice of the United States Supreme Court; he did

(continued...)

Following a severe stroke in July 2008, a former inmate at Utah State Prison, Brian Maguire,[1] asserted claims under 42 U.S.C. § 1983 against various medical and non-medical prison staff—including physician's assistant Chris Abbott, emergency medical technicians ("EMTs") Craig Jensen and Rodger MacFarlane, and a prison guard (occupying the position of Sergeant) who worked on Mr. Maguire's cell block, Jerry Miller (collectively, "Appellants")—for deliberate indifference to his serious medical needs in violation of the Eighth Amendment and the Utah Constitution.[2]

Following limited discovery, Appellants moved for summary judgment on qualified-immunity grounds, but the district court denied the motion, finding that

[**](...continued)
not participate in the consideration or preparation of this order and judgment. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. §46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co.*, 35 F.3d 45, 47–48 (2nd Cir. 1994) (remaining two judges of original three-judge panel may decide petition for rehearing without third judge), *cert. denied*, 513 U.S. 1082 (1995).

[1]    Following Mr. Maguire's death, the district court substituted Steve Spencer, the personal representative of Mr. Maguire's estate, as the plaintiff. For the sake of clarity, we—like the parties and the district court—will continue to refer to Mr. Maguire as the plaintiff, rather than Mr. Spencer.

[2]    In addition, Mr. Maguire brought claims against Mr. Abbott's supervisor, Dr. Richard Garden, and a prison nurse, Steven Mecham. The district court, however, found that these individuals were entitled to summary judgment on qualified-immunity grounds, and Mr. Maguire mounts no challenge to that determination on appeal.

the Appellants' qualified-immunity claims depended on the resolution of disputed facts. Appellants now appeal, arguing that their actions fall far short of establishing a violation of a clearly established constitutional right.

For the reasons that follow, we **DISMISS** Mr. Miller's appeal for lack of appellate jurisdiction. Exercising jurisdiction over the remainder of this appeal under 28 U.S.C. § 1291, we **REVERSE** the district court's denial of summary judgment on qualified-immunity grounds as to Mr. Abbott and the two EMTs, Mr. Jensen and Mr. MacFarlane, and **REMAND** with instructions to enter judgment in their favor.

# I

## A[3]

On July 3, 2008, Mr. Abbott (a physician's assistant) performed an intake examination of Mr. Maguire before releasing him into the prison population. During that assessment, Mr. Maguire explained that he had been on a methadone treatment program for opiate addiction, and he requested that he be placed on a methadone-tapering regimen. However, Mr. Abbott informed Mr. Maguire that the prison did not prescribe methadone and, instead, gave him medicine to reduce the deleterious effects of methadone withdrawal. Mr. Maguire spent the next week in

---

[3]     The district court recited the facts in the light most favorable to Mr. Maguire and Appellants generally accept that recitation, except as explained *infra*, for purposes of the pending appeal. We, in turn, track the factual narrative that the district court recounted.

and out of the prison infirmary, with complaints of an array of physiological and psychological problems.

On July 15, 2008, Mr. Maguire submitted an Inmate Health Request Form, claiming that he was "losing the[] use" of his "left arm and hand" and that he was "very worried and suffering mentally and physically." *See* Aplts.' App., Vol. IV, at 446 (Mem. Decision & Order Granting in Part and Den. in Part Defs.' Mot. for Summ. J., filed Dec. 15, 2015) (quoting the record). Later that day, a prison guard escorted him to Mr. Abbott, and informed Mr. Abbott that Mr. Maguire appeared to be dragging his left leg. In addition, Mr. Maguire himself expressed difficulty with controlling the left side of his body, including his left arm and extremities. While massaging Mr. Maguire's upper body, Mr. Abbott noticed a prominent spasm in his left trapezius muscle and applied pressure on the associated trigger point. Following that treatment, Mr. Maguire reported immediate relief. As a result, Mr. Abbott determined that Mr. Maguire suffered from a muscle spasm and prescribed a muscle relaxant and physical therapy.

That evening, however, Mr. Maguire's left arm began seizing, his left leg became numb, and he began convulsing. As a result, Mr. Maguire yelled for the other inmates to call "man down," and a prison guard, Mr. Miller, and EMTs Jensen and MacFarlane responded to the cell and witnessed Mr. Maguire convulsing. *Id.* The three men moved Mr. Maguire to the cell floor, where EMTs Jensen and MacFarlane checked his vital signs and determined that he had suffered

4

a seizure. Mr. Maguire, however, disputed this diagnosis, because he had never experienced a seizure, remained lucid throughout the event, and never blacked out. Nevertheless, EMTs Jensen and MacFarlane maintained their diagnosis and placed Mr. Maguire's mattress on the floor to prevent him from falling from his bunk if he had another seizure. They further told Mr. Maguire that there was nothing else they could do at that time, but that he should inform prison guards if he experienced any additional issues and the guards would alert them.

Throughout that night until early the next morning, prison guards—including, according to Mr. Maguire, Mr. Miller—passed by Mr. Maguire's cell to perform hourly inmate counts.[4] During each of these hourly counts, Mr. Maguire claims that he pleaded for assistance from the passing prison guards, but submits that each plea went unanswered. On the following morning—July 16, 2008—prison guards found that Mr. Maguire had urinated in his jumpsuit during the night, having been unable to get himself off of the floor. As a result, prison guards transferred him to the University of Utah Medical Center, where doctors determined that he had suffered a severe stroke.

**B**

In the aftermath of this diagnosis, Mr. Maguire filed the underlying civil-

---

[4] Mr. Miller argues that the district court's factual recitation on this point "blatantly contradicted" the underlying record. Aplts.' Opening Br. at 22–24. Nevertheless, we reject that notion for the reasons discussed *infra*.

rights complaint under 42 U.S.C. § 1983, asserting constitutional claims against Mr. Abbott, EMTs Jensen and MacFarlane, and Mr. Miller, among other individuals. Following limited discovery, Appellants moved for summary judgment on the grounds of qualified immunity. On December 15, 2015, however, the district court denied summary judgment to them.[5]

Addressing the existence of a constitutional violation—the first prong of the qualified-immunity inquiry—the district court concluded that the evidence created a sufficient factual inference of deliberate indifference relative to Mr. Abbott, because he diagnosed Mr. Maguire's condition as "a simple muscle spasm," despite the evidence that Mr. Maguire had "los[t] control o[f] the entire left side of his body." Aplts.' App., Vol. IV, at 452. Given those facts, the district court determined that Mr. Abbott's "contrary diagnosis and treatment" could be deemed "patently unreasonable," because a reasonable jury could conclude that the "loss of control" constituted a symptom "so obviously inconsistent with a simple muscle spasm in [the] shoulder . . . and so obviously consistent with the symptoms of a stroke." *Id.* With respect to EMTs Jensen and MacFarlane, the district court found

---

[5] The district court did enter summary judgment, however, in favor of two defendants, Dr. Richard Garden and Steven Meacham, *see* Aplts.' App., Vol. IV, at 449–50, 453–54 (finding no evidence of deliberate indifference relative to these defendants), and in favor of Mr. Abbott, solely insofar as Mr. Maguire asserted a claim "against Abbott for [his] involvement [in] the decision to discontinue Maguire's methadone prescription," *id.* at 451 n.7. The propriety of these rulings is not at issue here.

the record similarly sufficient to support an inference of deliberate indifference because the two men determined that Mr. Maguire had experienced a seizure (despite Mr. Maguire's contrary assertions) and, yet, failed to refer him to a medical specialist, opting instead to "simply place[] Maguire's mattress on the cell floor." *Id.* at 458–59. Finally, the district court found sufficient evidence that Mr. Miller acted with deliberate indifference, because the evidence suggested that he knew that "Maguire had suffered (at the very least) a seizure" and of his subsequent requests for medical assistance, but failed to notify medical professionals. *Id*. at 462.

Turning then to the question of clearly established law—the second prong of the qualified-immunity inquiry—the district court found it "clearly established" (1) that when Mr. Abbott confronted "symptoms obviously indicative of a stroke and inconsistent with a mere shoulder muscle spasm, the decision to merely treat the muscle spasm would evidence deliberate indifference to a serious medical condition," *id*. at 464; (2) that when EMTs Jensen and MacFarlane confronted "what they believed to be a seizure, they had an obligation to provide Maguire meaningful treatment or at least access to an appropriate health care provider," *id*.; and (3) that, when Mr. Miller confronted Mr. Maguire's requests for "further medical assistance"—"with the understanding that Maguire had suffered a seizure"—"he had the obligation to provide Maguire access to necessary medical personnel" *and* "fair notice that failing to provide such access would be sufficient

7

to show a constitutional violation," *id.*

Accordingly, the district court denied summary judgment on the basis of qualified immunity to Mr. Abbott, EMTs Jensen and MacFarlane, and Mr. Miller. This appeal followed.

## II

Appellants' appeal is interlocutory and, before reaching its merits, we must address whether we properly have jurisdiction. *See Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 385 F.3d 1279, 1286 (10th Cir. 2004) ("Jurisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end.").

## A

Federal appellate courts typically lack "jurisdiction to review denials of summary judgment motions," *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (quoting *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1150 (10th Cir. 2006)), but we may review "[t]he denial of qualified immunity to a public official . . . to the extent [the denial] involves abstract issues of law," *id.* (first alteration in original) (quoting *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013)); *see also Henderson v. Glanz*, 813 F.3d 938, 947 (10th Cir. 2015). Specifically, we have interlocutory "jurisdiction 'to review "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation."'"

8

*Cox*, 800 F.3d at 1242 (quoting *Roosevelt–Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

Applying that analytical framework, we have "no interlocutory jurisdiction to review 'whether or not the pretrial record sets forth "genuine" issues of fact for trial,'" *Henderson*, 813 F.3d at 948 (quoting *Johnson v. Jones*, 515 U.S. 304, 320 (1995)), because that inquiry would require "second-guessing the district court's determinations of evidence sufficiency," *id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001)); *see also Cox*, 800 F.3d at 1242 (explaining that "'whether or not the pretrial record sets forth a "genuine" issue of fact for trial' is *not* an abstract legal question that we may review" (quoting *Johnson*, 515 U.S. at 320)).

Rather, we may review "the *legal* question of whether a defendant's conduct, as alleged by the plaintiff, violates clearly established law." *Cox*, 800 F.3d at 1242 (emphasis added) (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001)). Hence, our jurisdiction becomes "clear" when "the defendant does not dispute the facts alleged by the plaintiff" *or* concedes the version of events most favorable to the plaintiff, and raises instead only *legal* challenges to the denial of qualified immunity based on those facts. *Id.* (quoting *Farmer v. Perrill*, 288 F.3d 1254, 1258 n.4 (10th Cir. 2002)).

Where a defendant challenges the district court's factual findings, "we may assess the case based on our own de novo view of which facts a reasonable jury

9

could accept as true," *if* the record "blatantly contradict[s]" the version of events that the district court has found, viewing the evidence in the light most favorable to the plaintiff. *Henderson*, 813 F.3d at 948 (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010)); *see York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (noting that "a court may not adopt a 'blatantly contradicted' version of the facts for summary judgment purposes" (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). However, the blatantly-contradicted exception imposes, by its very terms, a heavy burden, requiring that the district court's findings "constitute 'visible fiction.'" *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (quoting *Scott*, 550 U.S. at 380–81)); *see Roosevelt-Hennix*, 717 F.3d at 759 (explaining the "limited nature" of the blatantly-contradicted exception); *Green v. Post*, 574 F.3d 1294, 1296 n.4 (10th Cir. 2009) (declining to accept the district court's factual recitation that the traffic light was red, when "[t]he videotape of the collision, obtained from the camera on [the officer-defendant's] vehicle, shows that the light was yellow"); *see also Cordero v. Froats*, 613 F. App'x 768, 769 (10th Cir. 2015) (unpublished) (noting that the exception covers only the "rare" and "exceptional" case).

**B**

**1**

In light of these principles, we conclude that Mr. Abbott, and EMTs Jensen and MacFarlane have presented appellate arguments over which we have

jurisdiction, because they accept Mr. Maguire's version of the facts relating to them—more specifically, the facts as the district court recited them—for purposes of this appeal, and argue their legal entitlement to qualified immunity under *that* factual narrative.[6]  *See Cox*, 800 F.3d at 1243–44 (finding appellate jurisdiction where the defendant "accepted the truth of [the plaintiff's] version of the facts for purposes of an appeal," and requested that we address "the legal issues presented by [those] agreed-upon set of facts").

---

[6]     The district court framed its summary-judgment conclusions in terms of findings regarding what a "reasonable jury" could draw from the factual record *and* with respect to the existence of genuinely disputed issues of material fact.  Aplts.' App., Vol. IV, at 452–53 (finding, with respect to Mr. Abbott, that "a reasonable jury could conclude" that he acted with deliberate indifference and that the record contained "genuine dispute[s] of fact" relative to deliberate indifference); *id*. at 458–60 (finding, with respect to EMTs Jensen and MacFarlane, that "a reasonable jury could conclude" that they acted with deliberate indifference and that the record contained "genuine disputes" relative to deliberate indifference); *id*. at 462–63 (finding, with respect to Mr. Miller, that "a reasonable jury could conclude" that he acted with deliberate indifference and that the record contained "genuine disputes of fact" relative to deliberate indifference).  We are constrained to observe that, insofar as the district court's analysis focused on the existence of genuine disputes of material fact—it is not congruent with "our established qualified-immunity approach"—the "principal purpose" of which is "to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court."  *Cox*, 800 F.3d at 1243 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)).  Nevertheless, because Appellants (with the exception of Mr. Miller) have accepted the truth of Mr. Maguire's version of the facts for purposes of this appeal—a version of the facts that the district court embraced—we may reach the *legal* questions of qualified immunity based on that version of the facts, despite the noted deficiency in the district court's methodology.  *See Cox*, 800 F.3d at 1243 (reaching the legal issues in the context of a qualified-immunity, summary-judgment inquiry despite the district court's deficient "fact-based" "mode of analysis").

11

An inquiry into our jurisdiction over Mr. Miller's appeal cannot be resolved with the same ease. That is because Mr. Miller contends that the district court's factual recitation as to him is "blatantly contradicted" by the summary-judgment record on two grounds. Aplts.' Opening Br. at 22–24; *accord* Aplts.' Reply Br. at 4–7, 28. First, he claims that, contrary to the district court's reading of the record, Mr. Maguire actually "d[id] not allege that Sgt. Miller was the officer who performed the [night] rounds." Aplts.' Reply Br. at 4 (quoting the record). Second, he submits that the evidence the district court used to buttress its "version of events neither mentions nor identifies Miller as an officer who performed the hourly counts." *Id.* at 5; *accord* Aplts.' Opening Br. at 23–24. Our review of the evidence, however, reveals no blatant contradiction of the district court's assessment regarding these matters.

Tracing a factual narrative in Mr. Maguire's favor, the district court stated that, "prison guards—including, according to Maguire, defendant Miller— passed by Maguire's cell to perform hourly counts" following the "man down" incident, and explained that Mr. Maguire pleaded with prison guards "[d]uring each of these counts . . . to summon the EMTs because he was experiencing twitching and cramping throughout the left side of his body." Aplts.' App., Vol. IV, at 446–447. Based on this version of events, the district court found "sufficient evidence . . . for a reasonable jury to conclude [that] Miller personally performed at least one of the

nightly counts and . . . had actual knowledge" of Mr. Maguire's various requests for medical assistance. *Id*. at 461. In reaching this conclusion, the district court noted that Mr. Maguire did not point "to this evidence in his briefing," and instead took the "*litigation position* that Miller [could] be liable even if he did not personally perform the [hourly] counts." *Id*. at 461 n.10 (emphasis added). Nevertheless, the district court emphasized that it must "consider the record evidence" at the summary-judgment phase, and need not constrain its inquiry to Mr. Maguire's "legal arguments." *Id*.

The essential thrust of Mr. Miller's first challenge relates to the district court's failure to take into account that Mr. Maguire did not contest a purported statement of undisputed fact relating to Mr. Miller's lack of participation in the hourly counts that Appellants averred in their summary-judgment briefing. However, in acknowledging a certain group of factual statements in Appellants' briefing to be "undisputed," Mr. Maguire did not explicitly address Appellants' statement regarding Mr. Miller's lack of participation in the counts. Aplts.' App., Vol. III, at 243 (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J, filed May 15, 2015). As such, Mr. Maguire's response hardly resembles the sort of intentional factual stipulation—or admission—that our precedent prohibits district courts from disregarding. *See Stubblefield v. Johnson-Fagg, Inc.*, 379 F.2d 270, 272 (10th Cir. 1967) (explaining that the "trial court may not disregard facts stipulated to by the parties or require evidence to support them" (quoting *United States v. Sommers*,

13

351 F.2d 354, 357 (10th Cir. 1965))). Perhaps more importantly, Mr. Maguire's substantive summary-judgment arguments squarely presented his *factual* position that Mr. Miller did indeed perform the hourly counts. *See* Aplts.' App., Vol. III, at 262 (arguing that Mr. Miller either "failed to follow up on Mr. Maguire's condition by avoiding checking in on [him] or he *did* check in but failed to obtain help when requested"); *see also* Aplee.'s App., at 51 (Tr. of Hr'g on Mot. Summ J., dated Oct. 22, 2015) (arguing that the evidence impliedly creates an inference that Mr. Miller performed hourly counts).

Aside from all that, the district court clearly had the discretion, in any event, to inquire into the factual record in areas that the parties left underdeveloped. *See* FED. R. CIV. P. 56(c)(3) ("The court need only consider the cited materials, *but may consider other materials in the record*." (emphasis added)); *Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) (unpublished) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *Ayazi v. United Fed'n of Teachers Local 2*, 487 F. App'x 680, 681 (2d Cir. 2012) (unpublished) ("[W]hen assessing a summary judgment motion, a District Court 'may consider other materials in the record.' Thus, there was no error in the magistrate judge considering and relying on evidence not specifically cited by the [summary-judgment movant] . . . ." (quoting FED. R. CIV. P. 56(c)(3)).

Turning then to Mr. Miller's second challenge, he essentially posits that the district court mischaracterized record evidence in concluding that a "reasonable

14

jury [could] conclude [that] Miller personally performed at least one of the nightly counts." Aplts.' App., Vol. IV, at 461. On this point, the district court explained that,

> [i]n Maguire's sworn affidavit, he stated that "Officer 5," responded to the "man down" call and helped the EMTs place Maguire's mattress on the floor. The record shows, and Miller concedes, that he was one of the officers who responded to Maguire's cell during the "man down" call. Maguire's affidavit further states that the EMTs instructed him to alert "Officer 5" if he had any other problems throughout the night. Maguire later clarified that *Miller was the officer whom the EMTs indicated he should alert if he had any further problems during the night.* Therefore, a reasonable jury could infer that "Officer 5" in Maguire's affidavit refers to Miller. And importantly, Maguire stated in his affidavit that during "[e]very hourly count, *at some of which Maguire recognized Officer 5*[,] Maguire asked the counting officer to please call medical."

*Id*. at 461–62 (first and second emphases added) (citations omitted). With these facts in mind, the district court concluded that "a reasonable jury could infer" that Mr. Miller performed "some of the hourly counts and heard Maguire's pleas for help." *Id*. at 462.

In challenging these factual observations and inferences, Mr. Miller claims only that "the deposition testimony cited by the district court" makes no mention of Mr. Miller, and identifies by name instead *only* (non-party) Officer Mau. Aplts.' Opening Br. at 23–24; *accord* Aplts.' Reply Br. at 4–5. Mr. Miller's position, however, brushes aside the fact that, in his affidavit, Mr. Maguire specifically averred that he "recognized Officer 5" as *one* of the officers who performed "*some*"

15

of the hourly counts.  Aplts.' App., Vol. IV, at 332 (Aff. of Brian Maguire, dated Aug. 23, 2010).  And it is undisputed that Mr. Miller is the only prison guard who responded to the "man down" call.  *Compare id.* at 331 (explaining that, during the "man down" incident, "Officer 5 moved the mattress to the floor and put Maguire on [the] mattress"), *and* Aplee.'s Br. at xi (stating that "three" individuals responded to the "man down" call: Mr. Miller, and EMTs Jensen and MacFarlane), *with* Aplts.' App., Vol. II, at 194 (recounting, as part of Appellants' summary-judgment submissions, Mr. Miller's role during the "man down" call); Aplts.' Opening Br. at 9 ("Miller responded to the man down call and called for medical assistance").

As we see it, the underlying evidence created the reasonable inference that Mr. Miller responded to the "man down" call *and* performed *some* of the hourly counts that evening.  The fact that Mr. Maguire singled out Officer Mau in his deposition with respect to one of the many counts—that is, the 8:30 AM hourly count—does not undercut the reasonableness of this inference, especially given the equivocal, tentative nature of Mr. Maguire's identification of Officer Mau.  *See* Aplts.' App., Vol. IV, at 378 (Dep. of Brian Maguire, dated Jan. 15, 2015) ("At the 8:30 count when the count come [sic] through, the officer that counted, and I'm not sure, I'm not sure who that was, but I think it might have been Mau, officer Mau. Maybe, I'm not positive about that. But anyway, he told me that I needed to stand up for count and I told him 'I can't stand up, I can't even sit up. I can't get up to

16

do it.'").

Based on this evidence, the district court drew reasonable and supported inferences in Mr. Maguire's favor, and "we must accept 'as true' the district court's determination 'that a reasonable jury could find certain specified facts in favor of the plaintiff.'" *Pahls v. Thomas*, 718 F.3d 1210, 1217 (10th Cir. 2013) (quoting *Lewis*, 604 F.3d at 1225). In short, the district court's findings regarding Mr. Miller's participation in at least *some* of the hourly counts is not blatantly contradicted by the record. Indeed, even if we were to conclude that the evidence that Mr. Miller relies on demonstrates some contradiction with the district court's relevant factual recitation, that would not permit Mr. Miller to carry his burden of demonstrating that this recitation is a "visible fiction."[7] *Lynch*, 703 F.3d at 1160 n.2 (quoting *Scott*, 550 U.S. at 380–81). Therefore, we lack jurisdiction over Mr. Miller's interlocutory appeal because it "would [impermissibly] require second-guessing the district court's determinations of evidence sufficiency." *Henderson*,

---

[7]    Nor do we find this case to be analogous to the Supreme Court's *Scott* decision—which is the subject of the parties' dueling contentions. There, the "videotape quite clearly contradict[ed] the version of the story told by [the plaintiff] and adopted by the [court]." 550 U.S. at 378–80 (describing the video as "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury," while the plaintiff's version of events stated that the car chase involved "little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [the plaintiff] remained in control of [the] vehicle" (quoting *Harris v. Coweta Cty., Ga.*, 433 F.3d 807, 815 (11th Cir. 2005)). Here, the underlying record supports the version of events proffered by Mr. Maguire and adopted by the district court, as explicated *supra*.

17

813 F.3d at 949–50 (quoting *Medina*, 252 F.3d at 1130) (dismissing an interlocutory appeal for lack of jurisdiction, because the record did not blatantly contradict the district court's factual determinations).

For these reasons, we **DISMISS** Mr. Miller's appeal for lack of appellate jurisdiction.

## III

Turning to the merits, we address the substantive assertions of the qualified-immunity defense of Mr. Abbott, and EMTs Jensen and MacFarlane.

## A

"The defense of qualified immunity 'protects governmental officials from liability for civil damages insofar as their own conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."'" *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (quoting *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010)). Qualified immunity "not only protects public employees from liability, [but] also protects them from the burdens of litigation." *Id.* (alteration in original) (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013)).

"We review the denial of a summary judgment motion raising qualified immunity questions de novo." *Medina*, 252 F.3d at 1128; *accord Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). When a defendant raises the qualified-immunity defense, the plaintiff bears the burden of demonstrating "(1)

18

that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct." *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011)).  We address the two prongs of qualified immunity in either order; "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *Id.*; *see Medina*, 252 F.3d 1128 ("In short, although we will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (citation omitted)).

**B**

On appeal, Mr. Abbott challenges only the first prong of the district court's qualified-immunity determination, while EMTs Jensen and MacFarlane raise issues with respect to both aspects of the district court's qualified-immunity assessment. More specifically, Mr. Abbott asserts that Mr. Maguire's allegations demonstrate *at most* that he committed "an error in medical judgment" rising "no higher than negligence or [inadvertent] misdiagnosis"—*not* the deliberate indifference required for purposes of an Eighth Amendment claim.  Aplts.' Opening Br. at 29–37; *accord* Aplts.' Reply Br. at 10–16.  Similarly, EMTs Jensen and MacFarlane take the position that their diagnosis and treatment amounted to no more than "negligence" or "gross negligence"; they also submit that no clearly established law revealed that

19

their actions rose to the level of a constitutional deprivation. Aplts.' Opening Br. at 38–51; *accord* Aplts.' Reply Br. at 16–28.

Mr. Maguire argues, by contrast, that the relevant record demonstrates deliberate indifference on the part of Mr. Abbott, because he dismissed "Mr. Maguire's obvious signs of a stroke as mere muscle spasms," by ignoring plainly-presented symptoms and, generally, provided "patently unreasonable" treatment. Aplee.'s Br. at 18–21. Relatedly, Mr. Maguire takes the view that the "evidence establishing Jensen and Mac[F]arlane's deliberate indifference *abounds*," *id.* at 22, because in the face of a purported seizure, EMTs Jensen and MacFarlane simply "put Mr. Maguire onto the floor, closed the door, and left him there" without determining the cause of the purported "seizure," *id.* at 23, and without referring him "to desperately-needed medical care," *id.* at 25.

We elect to focus solely on the first prong of the qualified-immunity standard—that is, on whether Mr. Maguire has demonstrated that Mr. Abbott and EMTs Jensen and MacFarlane violated his constitutional rights, specifically, his Eighth Amendment rights. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). We conclude that Mr. Maguire has not carried his summary-judgment burden as to any of these officials.

20

Consequently, we reverse the district court's denial of summary judgment to Mr. Abbott, and EMTs Jensen and MacFarlane, and remand with instructions to enter judgment in their favor. *See, e.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc) ("Even taking Plaintiffs' allegations as true and viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have not established that Defendants' use of force against Rick Cortez violated his Fourth and Fourteenth Amendment right to be free from the use of excessive force. In other words, the Defendants are entitled to qualified immunity on Rick Cortez's excessive force claim because no constitutional violation occurred."); *Clark v. Bowcutt*, 675 F. App'x 799, 805 (10th Cir. 2017) (unpublished) ("We elect to focus on the first prong—*viz.*, whether the defendant committed a constitutional violation—and it proves dispositive.").

## C

### 1

The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits deliberate indifference to an inmate's serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996), and "involves both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). In this case, Mr. Abbott and EMTs Jensen and MacFarlane concede that the objective

21

component is satisfied, and so we turn our attention directly to the subjective

aspect of the deliberate-indifference standard. *See* Aplts.' Opening Br. at 28

("Defendants conceded below that the objective prong is satisfied.").

In order to satisfy the subjective prong, the prison official must have a

sufficiently culpable state of mind—meaning that the plaintiff must establish that

the prison official "kn[e]w of and disregard[ed] an excessive risk to inmate health

or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Mata*, 427 F.3d

at 751 (citing *Farmer* for the same premise). Stated another way, the subjective

component requires proof that a defendant official was both "aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists"

*and* that the official actually "dr[ew] the inference." *Farmer*, 511 U.S. at 837.

Accordingly, "allegations of 'inadvertent failure to provide adequate medical care'

or of a 'negligent . . . diagnos[is]' simply fail to establish the requisite culpable

state of mind." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991) (citation omitted);

*accord Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008) (explaining that a

medical provider's "negligent diagnosis or treatment of a medical condition do[es]

not constitute a medical wrong under the Eighth Amendment" (alteration in

original) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980))).

Similarly, "[a] prison medical professional who serves 'solely . . . as a gatekeeper

for other medical personnel capable of treating the condition' may be held liable

under the deliberate indifference standard [only] if [the professional] 'delays or

22

refuses to fulfill that gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211).

Nevertheless, "[d]eliberate indifference does not require a finding of express intent to harm," *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996), nor must a plaintiff "show that a prison official acted or failed to act believing that harm actually would befall an inmate," *Mata*, 427 F.3d at 752 (quoting *Farmer*, 511 U.S. at 842). Rather, the plaintiff must show that "the official acted or failed to act *despite his knowledge of a substantial risk* of serious harm." *Id*. (quoting *Farmer*, 511 U.S. at 842). Thus, "[a]n official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Id*. (quoting *Farmer*, 511 U.S. at 843 n.8).

**2**

Applying the foregoing principles here, we conclude that Mr. Maguire's allegations fail to demonstrate that Mr. Abbott acted with deliberate indifference to Mr. Maguire's serious medical needs. Rather, Mr. Maguire's version of events demonstrates, *at most*, that Mr. Abbott exercised reasonable medical judgment, but ultimately misdiagnosed Mr. Maguire's condition.

Specifically, Mr. Maguire expressed problems controlling the left side of his body (including his left arm and hand), and the prison guard that escorted Mr. Maguire for treatment informed Mr. Abbott that Mr. Maguire appeared to be

23

dragging his left leg. Based on that information, Mr. Abbott proceeded to massage the upper portion of Mr. Maguire's body, and immediately noticed "a prominent spasm in [his] left trazepius muscle." Aplts.' App., Vol. IV, at 446. Mr. Abbott consequently applied pressure to the associated trigger point, and Mr. Maguire reported "some immediate relief." *Id*. Given the palliative effect of the targeted massaging, Mr. Abbott determined—as a matter of medical judgment—that Mr. Maguire's symptoms related to a muscle spasm, and he prescribed a muscle relaxant and physical therapy for Mr. Maguire. *See id*.

Citing *Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001), *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013), and *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014), Mr. Maguire, however, advances the view—as did the district court—that Mr. Abbott consciously disregarded his serious medical needs, by approaching "an obvious risk with patently unreasonable treatment." Aplee's Br. at 16. But we see things differently: Mr. Abbott's reasoned diagnosis and treatment hardly resembles the obviously unreasonable treatment scenarios that were sufficient to satisfy the subjective inquiry in *Oxendine*, *Blackmon*, and *Gomez*.

In *Oxendine*, for example, the prison doctor repaired a severed finger but failed to diagnose the onset of gangrene. *See* 241 F.3d at 1277–78. In finding the allegations sufficient to satisfy the subjective component of the deliberate-indifference inquiry (on a dismissal motion), we emphasized (1) that the inmate repeatedly claimed to be suffering considerable pain and informed the doctor that

24

"his finger 'had turned jet black'" and that the reattached portion of his finger had begun to fall off; and (2) that the doctor himself recognized and noted the "necrosis" on the reattached finger, but took *no* action. *Id*. at 1278–79. Given the patent seriousness of the plaintiff's injury—upon visual inspection—which the plaintiff repeatedly validated by his complaints of pain, we reasoned that the situation involved more than a "mere disagreement between the parties" regarding the proper course of medical treatment, *id*. at 1277 n.7, and concluded that the allegations stated a claim for deliberate difference to serious medical needs, *id*. at 1279. Put another way, we effectively concluded that under these circumstances a reasonable jury could find that the doctor was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" *and* that the doctor actually "dr[ew] the inference." *Farmer*, 511 U.S. at 837.

Similarly, in *Blackmon*, an eleven-year-old child at a juvenile detention facility exhibited mental health issues, and the mental health unit supervisor and a counselor *knew* of his "obvious" mental health issues, *knew* that his incarceration exacerbated those problems, and *knew* that their response to his mental health issues—strapping him in a restraint chair—offered no help. 734 F.3d at 1244–45. Nevertheless, the officials denied him, or caused delay in his receipt of, access to mental health treatment, despite his *known* and "serious suicidal and self-harm problems." *Id*. at 1245. In light of these striking circumstances, we determined that the record was sufficient "to suggest conscious disregard of a substantial risk

25

of serious harm," because the officials "failed to provide him with access to obviously needed medical care for what was clearly a life-threatening condition." *Id*. at 1245–46.

Finally, in *Gomez*, officers put an arrestee in a "carotid restraint"—a technique that "compresses the carotid arteries and the supply of oxygenated blood to the brain" and renders "a person unconscious within 10–20 seconds." 745 F.3d at 413. The officers' training materials warned that "*[b]rain damage or death could occur*" if used "*for more than one minute*." *Id*. (alteration in original). Nevertheless, officers applied the technique to a prisoner for nearly three minutes and then turned to other "pain compliance technique[s]," all while the prisoner remained "motionless on the floor." *Id*. at 413–15. The officers then carried his "limp and unconscious" body to a holding cell, *id*. at 431, and "placed him face down on the cell floor" without checking his vital signs or attempting to determine whether he needed medical attention, *id*. at 415. When the nurse finally arrived—approximately five minutes after the officers' use of force—attempts to resuscitate the prisoner proved unsuccessful, and an autopsy reported the cause of death as "cardiorespiratory arrest during physical restraint." *Id*. at 416.

In affirming the denial of qualified immunity, we reasoned in *Gomez* that the officers "had a front-row seat to [the prisoner's] rapid deterioration" and knew the "substantial risk" their pain-compliance techniques posed to the prisoner's "health and safety," yet delayed for what—under the particular circumstances

there—amounted to a substantial amount of time before providing him with obviously necessary medical attention. *Id*. at 431–33. Accordingly, we concluded that the factfinder could "conclude that [the officers] subjectively knew of the substantial risk of harm by circumstantial evidence" or by the obviousness of the risk. *Id*. at 433 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009)).

In each of these cases—*Oxendine*, *Blackmon*, and *Gomez*—we concluded that a reasonable jury could find that the defendant official possessed a culpable state of mind primarily because the "facts from which the inference could be drawn that a substantial risk of serious harm exists," *Farmer*, 511 U.S. at 837, were remarkably obvious and the defendant had, in the words of *Gomez*, a "front-row seat" to observe them, 745 F.3d at 431. While Mr. Abbott did directly interact with Mr. Maguire, the circumstances here are otherwise markedly different.

Though the parties do not dispute that Mr. Maguire had a "sufficiently serious" medical need, *Farmer*, 511 U.S. at 834 (i.e., the objective component of the deliberate-indifference standard), the facts from which Mr. Abbott could have inferred the existence of that medical need—and, consequently, known the "substantial risk" that "serious harm" would befall Mr. Maguire, if that need were not addressed, *id.* at 837—were not obvious, when viewed through the prism of *Oxendine*, *Blackmon*, and *Gomez*. Notably, Mr. Maguire visually presented to Mr. Abbott in part with a prominent spasm in his left trapezius muscle. Rather than his condition continuing to decline before Mr. Abbott's eyes—*see Oxendine*, 241 F.3d

27

at 1278 (noting that the inmate repeatedly claimed to be suffering considerable pain and informed the doctor that the reattached portion of his finger had begun to fall off); *Gomez*, 745 F.3d at 431 (noting that officers "had a front-row seat to [the plaintiff's] rapid deterioration"); *Blackmon*, 734 F.3d at 1245 (observing that the defendants "were aware those [mental health] problems [of the plaintiff] grew worse during his stay")—Mr. Maguire experienced immediate relief from Mr. Abbott's physical application of pressure to the associated trigger point. Given this positive clinical response, Mr. Abbott reasoned that muscle spasms were the root cause of Mr. Maguire's concerns regarding mobility on the left side of his body. And, unlike the defendants in *Oxendine*, *Blackmon*, and *Gomez*, Mr. Abbott did not ignore the medical need that he perceived; rather, he affirmatively acted to address it by prescribing a muscle relaxant and physical therapy.

To be sure, in light of Mr. Maguire's subsequent stroke, a plausible argument could be made that Mr. Abbott's conclusion that Mr. Maguire suffered from muscle spasms was off-base; in other words, that he misdiagnosed Mr. Maguire. But the fact that Mr. Abbott's reasoning may have amounted to negligence is immaterial for purposes of the subjective component of the deliberate-indifference standard. *See, e.g.*, *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.");

28

*Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006) ("[M]isdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim."); *see also Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) ("Even if the conclusion [the prison official] drew from his investigation was erroneous or negligent, it does not rise to the level of an Eighth Amendment violation based on deliberate indifference.  Deliberate indifference requires more than a showing of simple or heightened negligence."); *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) (rejecting the plaintiff's subjective-component argument by noting that her "complaints suggest negligence—not a wanton and obdurate disregard for inmate health and safety").

More specifically, our caselaw firmly establishes that a doctor's exercise of "considered medical judgment" fails to fulfill the subjective component, "absent an *extraordinary* degree of neglect"—*viz.*, where a prison physician "responds to an obvious risk" with "patently unreasonable" treatment.  *Self*, 439 F.3d at 1232 (emphasis added).  "[I]n the circumstances of a missed diagnosis or delayed referral," we have only found a sufficiently extraordinary degree of neglect under three circumstances: *first*, where a doctor "recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise" but refuses or unnecessarily delays a referral; *second*, where a doctor *fails* to treat a medical condition "so obvious that even a layman would recognize

29

the condition"; and *finally*, where a doctor entirely denies care "although presented with recognizable symptoms which potentially create a medical emergency." *Id.*

Mr. Maguire's argument is essentially predicated on the second circumstance. He contends that the partial loss of motor control constitutes an "obvious sign[] of a stroke." Aplee.'s Br. at 18. Importantly, however, Mr. Maguire mounts no attack on the notion that the loss of motor control also may be suggestive of a muscle spasm, nor does he dispute that Mr. Abbott's pressure-point treatment provided him with immediate relief. Rather, Mr. Maguire advances the view that Mr. Abbott should have recognized his symptoms as being *more consistent* with a stroke, and submits that his failure to do so constitutes deliberate indifference. We are not persuaded.

We limit our subjective inquiry "to consideration of the [medical professional's] knowledge at the time he prescribed treatment for the symptoms presented, *not to the ultimate treatment necessary*," *Self*, 439 F.3d at 1233, and the fact that Mr. Maguire's symptoms could have *also* pointed to other, more serious conditions fails "to create an inference of deliberate indifference" on Mr. Abbott's part, *id.* at 1235. *See also Farmer*, 511 U.S. at 838 (noting that an "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment"); *Self*, 439 F.3d at 1234 ("Where a doctor faces symptoms that could suggest either indigestion or stomach cancer, and the doctor mistakenly

30

treats indigestion, the doctor's culpable state of mind is not established even if the doctor's medical judgment may have been objectively unreasonable."). Indeed, where the medical professional "provides a level of care *consistent* with the symptoms presented by the inmate, absent evidence of *actual knowledge or recklessness*, the requisite state of mind cannot be met." *Self*, 439 F.3d at 1233 (emphases added). In this case, Mr. Maguire has presented no evidence of actual knowledge or recklessness, and the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Id.* (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

In sum, we do not believe that a reasonable factfinder could infer that Mr. Abbott possessed the requisite culpable state of mind to satisfy the deliberate-indifference standard, even if he misdiagnosed Mr. Maguire's condition. Mr. Maguire was required to present evidence—not conjecture or speculation—that Mr. Abbott displayed a "conscious disregard of a substantial risk of serious harm arising from [his] symptoms." *Id.* at 1233. This he has not done.[8] *See id.* at 1235

---

[8] Mr. Maguire argues that Mr. Abbott "completely ignored symptoms Mr. Maguire exhibited," because his "simple-spasm" diagnosis explained only the issues Mr. Maguire experienced in his left arm, and not any issue with his left leg. Aplee.'s Br. at 19–20. In making that argument, however, Mr. Maguire points to no actual evidence that Mr. Abbott consciously disregarded any symptom *at the time of the examination*, and instead simply speculates, without support, that Mr. Abbott's alleged misdiagnosis leads to the ineluctable conclusion that he *consciously disregarded* Mr. Maguire's complaints

(continued...)

31

(finding the evidence of the subjective component wanting where a doctor treated the plaintiff for a respiratory condition (a misdiagnosis), when his symptoms also suggested a heart condition called endocarditis (his actual condition)); *see also Sealock*, 218 F.3d at 1208–12 (finding the subjective component not met where a prison nurse misdiagnosed an inmate's chest pains, because the facts indicated "at most" negligent diagnosis or treatment); *Heidtke v. Corr. Corp. of Am.*, 489 F. App'x 275, 282–85 (10th Cir. 2012) (unpublished) (citing *Self*, and finding that a medical professional's misdiagnosis did not evidence deliberate indifference, because the medical professional took measures to address the symptoms he perceived).

For the foregoing reasons, we reverse the district court's denial of qualified immunity to Mr. Abbott on Mr. Maguire's Eighth Amendment deliberate-

---

[8](...continued)
concerning his left leg. To the contrary, the record evidence reflects that Mr. Abbott reviewed Mr. Maguire's symptoms, conducted an examination, and prescribed a course of treatment based upon Mr. Maguire's favorable response to targeted massage treatment. Accordingly, we find that Mr. Maguire's argument misses the mark.

Relatedly, Mr. Maguire argues that, based on "Abbott's knowledge of Mr. Maguire's age," a "reasonable jury could presume that Mr. Abbott knew of Mr. Maguire's serious medical need" and responded to it in a "deliberately indifferent manner." Aplee.'s Br. at 20. Mr. Maguire, however, never raised this argument before the district court, and he has not argued for plain error on appeal; therefore, the argument is effectively waived. *See, e.g.*, *Richison v. Ernest Grp. Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court.").

indifference claim and remand with instructions to enter summary judgment in favor of Mr. Abbott.

**3**

With respect to EMTs Jensen and MacFarlane, we similarly conclude that Mr. Maguire has failed to establish the subjective component of the deliberate-indifference standard. Based on our review of the summary-judgment record, and guided by the legal standards explicated *supra*, we can conclude that EMTs Jensen and MacFarlane exercised considered medical judgment in determining that Mr. Maguire had experienced a minor seizure, and, relatedly, we cannot discern any significant ground for the contrary view that they "consciously disregarded a substantial risk of harm" to Mr. Maguire. *Self*, 439 F.3d at 1235. Accordingly, Mr. Maguire's Eighth Amendment deliberate-indifference claim against EMTs Jensen and MacFarlane also must fail.

Like the plaintiff in *Self*, Mr. Maguire "cannot argue he was denied medical treatment. He was not." *Id.* at 1234. Recall that EMTs Jensen and MacFarlane responded to the "man down" call for emergency medical assistance, witnessed Mr. Maguire convulsing, checked his vital signs, and assessed his overall condition. Aplts.' App., Vol. IV, at 446. Considering his symptoms, and the fact that he remained lucid and communicative throughout their assessment, they determined

33

that Mr. Maguire had experienced a seizure.[9] Although Mr. Maguire quarreled

with that diagnosis, Mr. Maguire demonstrated no symptoms suggesting that he

needed immediate or emergency medical treatment.  Accordingly, EMTs Jensen

and MacFarlane left Mr. Maguire's cell after moving his mattress to the floor for

safety, instructing him to contact the guards if his condition changed.  Even with

the benefit of all favorable inferences, these facts fail to rise to the level of

deliberate indifference.

Mr. Maguire's two arguments to the contrary are unavailing.  First, he argues

that EMTs Jensen and MacFarlane effectively denied him medical care or, at a

minimum, provided him with woefully inadequate medical care under the

circumstances.  Even Mr. Maguire's version of events, however, demonstrates the

opposite.  As noted, EMTs Jensen and MacFarlane evaluated Mr. Maguire's

symptoms and determined, as a matter of medical judgment, that he suffered a

seizure.[10]  Under the circumstances, that diagnosis presented no obvious risk of

[9]      In their appellate briefing, EMTs Jensen and MacFarlane argue that Mr.
Maguire suffered a "simple partial seizure," and urge us to take judicial notice of their
asserted definition of the technical medical term "simple partial seizure."  Aplts.' Reply
Br. at 18 n. 4; *see also id.* at 18–19 (defining a "simple partial seizure" as "localized
motor symptoms on one side of the body (muscle jerks, isolated twitching, and tingling,
numbness, or weakness of arm or leg)").  Nevertheless, because we conclude that Mr.
Maguire's allegations fail to demonstrate deliberate indifference (regardless of the precise
definition of "seizure"), we decline their invitation.

[10]      Although Mr. Maguire disputed the diagnosis, "a prisoner who merely
disagrees with a diagnosis or a prescribed course of treatment *does not* state a
constitutional violation."  *Perkins*, 165 F.3d at 811 (emphasis added); *accord Ramos*, 639

(continued...)

34

immediate danger, particularly given Mr. Maguire's ongoing coherence throughout their assessment. Nevertheless, EMTs Jensen and MacFarlane specifically advised Mr. Maguire to notify the guards if he experienced any additional issues. Accordingly, they provided *actual* medical treatment to a conscious and lucid individual who displayed symptoms they recognized as reflective of a seizure. This conduct is easily distinguishable from circumstances involving a medical professional's complete denial of obviously necessary medical care or provision of patently unreasonable medical treatment—which *Self* tells us militate in favor of a finding of deliberate indifference. *See Self*, 439 F.3d at 1232–33; *cf. Blackmon*, 734 F.3d at 1244 (finding that prison mental health professionals were not entitled to summary judgment on qualified-immunity grounds where they failed to provide a pretrial detainee with "any meaningful mental health care, despite his obvious need for it"). Even assuming *arguendo* the diagnosis of EMTs Jensen and MacFarlane under the circumstances then before them (rather than as later developed) was wrong, it is beyond peradventure that "a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim." *Self*, 439 F.3d at 1234; *see also Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1495 (10th

_____

[10](...continued)
F.2d at 575 ("[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.").

Cir. 1990) (noting that "[d]eliberate indifference" requires "a higher degree of fault than negligence, or even gross negligence").

And, second, Mr. Maguire essentially contends that EMTs Jensen and MacFarlane failed to fulfill their gatekeeper function by improperly denying him access to further medical treatment. *See Sealock*, 218 F.3d at 1211 (explaining that a medical professional may act with deliberate indifference if he serves "as a gatekeeper for other medical personnel capable of treating the condition[] and . . . delays or refuses to fulfill that gatekeeper role" in the face of an obvious need for additional treatment or referral); *see also Self*, 439 F.3d at 1232 (same). Significantly, gatekeeper liability only attaches "where the need for additional treatment or referral to a medical specialist is obvious." *Self*, 439 F.3d at 1232. Here, again, Mr. Maguire has not demonstrated that his symptoms were inconsistent with an episodic seizure of the kind that EMTs Jensen and MacFarlane diagnosed him as having—which required no additional treatment or referral for further treatment. *Cf. Mata*, 427 F.3d at 755, 758 (finding that a nurse "completely refused to fulfill her duty as [a] gatekeeper" where she observed obvious signs of a medical emergency (e.g., *unexplained* chest pains), but "neither administered first aid nor summoned medical assistance despite [the inmate's] plea for medical attention"). Accordingly, the decision of EMTs Jensen and MacFarlane not to refer Mr. Maguire for an additional medical assessment and treatment fails to meet the "high evidentiary hurdle" for deliberate indifference under a gatekeeper theory.

*Self*, 439 F.3d at 1232.

For all of these reasons, we reverse the district court's order denying qualified immunity to EMTs Jensen and MacFarlane, and remand with instructions to enter summary judgment in their favor.

**IV**

Based on the foregoing, we **DISMISS** Mr. Miller's appeal for lack of appellate jurisdiction, and we **REVERSE** the district court's denial of summary judgment on qualified-immunity grounds to Mr. Abbott and EMTs Jensen and MacFarlane, and **REMAND** with instructions to enter judgment in their favor.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge